### COE et al. v. AIKEN et al.

#### (Circuit Court, D. New Hampshire. August 26, 1893.)

#### No. 228.

1. EMINENT DOMAIN—CONTRACT—ESTOPPEL.
   A party asking relief against a railway company upon a contract which necessarily assumes a right of eminent domain in the latter cannot, in the same suit, complain of an additional taking of lands, on the ground that the company is not of a kind to be invested with such right.

2. SAME—FRAUDULENT LOCATION—SETTING ASIDE.
   A court of equity cannot set aside an adjudication of a proper tribunal determining and locating the quantity of lands required for a public use merely because the parties who brought about the adjudication had a fraudulent or illegal intent; but it must appear that the tribunal itself proceeded fraudulently, or in excess of its powers, or that it committed a gross mistake, or was imposed upon by fraudulent methods.

3. SAME—EXTENT OF LOCATION—EQUITY JURISDICTION.
   A court of equity has power to determine whether the amount of land taken is needed for public use, but in this respect the courts are liberal towards the party exercising the right, as the owner is protected by the requirement for compensation; and every reasonable intendment will be made in favor of the adjudication of the tribunal awarding the lands.

4. SAME—UNCERTAINTY OF LOCATION.
   A location of lands taken for public use cannot stand if it is uncertain in law; but that it is uncertain in fact, so as to require a resort to the courts for settlement of its boundaries, does not render it uncertain in law, for in law that is certain which can be made certain.

5. CONTRACT—CONSTRUCTION—LEASE.
   The owners of a mountain summit leased a portion thereof to a tourists' railroad company for five years, with the privilege of erecting an hotel and other buildings thereon. At the termination of the lease, the lessors were to have the right to purchase whatever buildings were on the premises, whether within or without the limits of the railroad right of way, "excepting such parts of said buildings and improvements within said limits as may be required by said second party for the proper and convenient use of its road, and for its engines, cars, and repairs." A hotel and other buildings were accordingly erected, partly within and partly without the railroad location. The lease was twice renewed, and after the expiration of the last term, and before any adjustment was reached, the railroad company made an additional location, which was claimed to include the hotel and most of the other buildings. *Held*, that the question whether or not the buildings were required for railroad purposes was to be determined by the condition of things at the termination of the lease; that, reading the contract as a whole, the lessors were not to take any buildings re-

quired for strictly railroad uses, whether situated within or without the original location; that the word "required" should be read as "fairly required;" and that the hotel was not thus required for railroad purposes, as was conclusively proved by the fact that the railroad people had rented it to be run substantially as the lessors must run it, if they took it.

This is a bill in equity brought by Ebenezer S. Coe and David Pingree, trustees, against Walter Aiken, the Boston, Concord & Montreal Railroad Company, the Mt. Washington Railway Company, and the Concord & Montreal Railroad Company for specific performance of a contract, and the setting aside of a railroad location, and for an injunction to restrain the defendants from maintaining an hotel on Mt. Washington. See 50 Fed. 637, 640.

The complainants allege that they were owners of the land covering the summit of Mt. Washington; that on the 1st day of July, 1872, the Jackson Iron Manufacturing Company, then the owners of the summit, executed a lease to the Mt. Washington Railway Company of the land included within a circle of the radius of 100 rods in length, extending from the central point of the end of the Mt. Washington railway on the summit; that the lease was given with the view that the railway company should erect an hotel upon the summit, or permit some person to erect one, reserving to the lessors the right at the expiration of the term of the lease to purchase whatever buildings and improvements then should be on the premises, including that portion of said buildings that should be within the limits of the railroad as located, except such parts of said buildings and improvements as might be required by said railroad company "for the proper and convenient use of its road, and for its engines, cars, and repairs," at their original cost, and, relying upon the performance of said agreement, the iron manufacturing company permitted the hotel to be erected upon the premises thus leased; that the hotel was in fact built by Walter Aiken and the Boston, Concord & Montreal Railroad, and mainly located upon the location of the Mt. Washington Railway Company upon the summit of the mountain, but some portion of it being outside of that location, and upon the leased premises. Before the expiration of the said first lease, the title to the summit was transferred from the Jackson Iron Manufacturing Company to the complainants, as trustees of the estate of David Pingree, deceased, who, applying for statement of the cost of hotel, received from Aiken and the Boston, Concord & Montreal Railroad a statement of cost amounting to $70,000, which complainants believe much larger than the actual cost, and made fraudulently and purposely to prevent complainants taking the hotel, and to enable the owners to retain it for another five years. On the 26th day of October, 1877, the complainants executed a second lease to the Mt. Washington Railway Company, with substantially the same provisions as to the conveyance of the buildings to the lessors as were contained in the first lease, except that they were to be conveyed to them at an appraisal. The bill alleges that under this second lease an attempted appraisal was made, but defendant Aiken objected to the appraisal being made, on the ground that he and the Boston, Concord & Montreal Railroad were the owners of the hotel and furniture, and were not bound by the contracts contained in the lease; that on the 9th day of May, 1883, the complainants executed a third lease to the Mt. Washington Railway Company for the term of five years from the 1st day of November, 1882, of the same premises as were described in the other leases, and with the same provision as to the conveyance of the buildings, furniture, fixtures, and improvements at the termination of the lease, the value of said property to be determined by the parties, and, if they could not agree, then to be determined by an appraisal by three disinterested parties to be agreed upon, or, in case they could not agree, the appraisers were to be appointed by the chief justice of the supreme court of New Hampshire upon the application of either party, and in this last lease it was agreed that no new or additional buildings should be erected by the lessees upon the premises without the consent of the lessor. The defendants Aiken and the Boston, Concord & Montreal Railroad were parties to this lease, and by the

lease it was provided that, in case the plaintiffs should desire to purchase the property referred to at the expiration of the lease, the Mt. Washington Railway Company should have the right to include in the sale all rights, titles, and interest of said Aiken and the Boston, Concord & Montreal Railroad, or either of them, as owners, and make proper and sufficient conveyance thereof to the plaintiffs, with the understanding that the Mt. Washington Railway Company should account to Aiken and the Boston, Concord & Montreal Railroad, respectively, for the value of their rights in the property so sold and conveyed, and that each party should execute such further instruments as might be necessary and proper to carry into full effect the intent and meaning of said indenture. In the lease, the Mt. Washington Railway Company agreed with the plaintiffs that they might use the buildings and improvements, wherever they were located and built, for the same purposes and uses as they had been used and occupied, for the term of five years after the expiration of the lease, and that, at the expiration of said five years, the plaintiffs might remove the improvements and buildings from said railroad location for their own use and control, and manage the business therein in a proper manner so as to furnish good accommodation therein to the public, or that they would cause the same to be done. Under the provisions of the last lease, Mr. Aiken, by permission of the plaintiffs, built an addition to the hotel outside of the railroad location, and on the leased premises. On the date of the expiration of the last lease, the complainants applied to the railway, Mr. Aiken, and the Boston, Concord & Montreal Railroad for an appraisal of the property; thereupon they were served with notice in the name of the railway company that the company needed the buildings for railroad purposes. The original location of the Mt. Washington Railway Company was made in 1869, and in 1889 the railroad commissioners of New Hampshire made an additional location which covered the whole site of the Summit House and addition which the complainants claimed to have conveyed to them under the terms of the last lease, and of such form and extent as to render the remaining land on the summit of no value for the erection of an hotel thereon; and the present hotel is maintained by the railway company without right or authority, and it has forfeited all right to the land so devoted by them. Said additional location was defective on the ground that the return made by the commissioners did not correspond with the monuments fixed upon the ground, or with the monuments described in the commissioners' return; and the additional location was made for the purpose of avoiding the performance of the contract, and was not for the legitimate and proper use of the railway company, but was intended for the use and purposes of Mr. Aiken and the Concord & Montreal Railroad, who were then the owners of the interest of the Boston, Concord & Montreal Railroad in the hotel, to enable them to maintain the hotel for their own use, the original railroad location upon the summit being sufficient for all the legitimate uses of the railroad. After the expiration of the last lease, November 1, 1887, the Mt. Washington Railway Company paid the rental to the plaintiffs for two years, and, immediately after the filing of the additional location, Mr. Aiken notified the plaintiffs that he should not continue to pay rent. Since that date Aiken and the Concord & Montreal Railroad have leased the hotel at an annual rental of $9,000 a year.

The bill further alleges, in substance, that the railroad was a unique thing, built with a cog rail for the purpose of carrying sightseers from the base to the summit of the mountain, and was not such a railroad as would entitle the railroad company to take property of an individual, under the right of eminent domain, for the public use. The bill prays for the specific performance of the contract to assign and convey the hotel to the plaintiffs, and that there should be a portion or all of said additional location set aside and assigned to them as would give them a convenient and proper site upon the summit for the hotel when assigned to them, and also that said additional location should be set aside on account of its not being authorized, and on account of its having been used and appropriated to improper use as alleged in the bill; and the bill further prays that Aiken and the Concord & Montreal Railroad should account for the rental of the hotel after the time they refused to pay the ground rent, and that the defendants be perpetually enjoined from using any part of the land on the summit for hotel purposes.

The answer admits the original location of the Mt. Washington Railway Company under an act of the legislature of the state of New Hampshire in the year 1869, but denies that said location included any land upon the summit for side tracks, wood sheds, repair shops, engine, car, and freight houses, turntables, and depot purposes, or that said original location was ever sufficient for the proper uses of the railway company. It admits the execution of the several leases set out in the bill, but denies that they were executed for the purposes claimed in the bill. It alleges that, immediately upon the first location of the road, it became manifest that, for the security of travelers to the summit, it was necessary that a suitable building should be erected for a railroad station, and to afford shelter to passengers upon the summit of the mountain, and that the railway company negotiated with Mr. Aiken and Mr. Lyon, president of the Boston, Concord & Montreal Railroad, to erect a railroad station, which station should contain facilities for lodging and caring for travelers, and that it was within the legal powers of the railway company to cause said building to be erected for those purposes; that Aiken and the Boston, Concord & Montreal Railroad procured the lease from the Jackson Iron Manufacturing Company, and made the addition to the original building upon the land so leased, and that Aiken and the Boston, Concord & Montreal Railroad ever since furnished to the Mt. Washington Railway Company adequate station facilities in the building, and accommodations for lodging and board of travelers and employes; that all the indentures between the plaintiffs and defendants were subject to the rights and interest of the railway company in the land included within the original location, and that all buildings upon the summit required for the proper and convenient use of the railway were, by the terms of the indenture, exempted from sale or transfer to, or ownership or occupation by, the complainants, and by force of these provisions the complainants are not entitled to any decree for the sale and transfer of said buildings to them so long as the same are required by the railway for its station, or a place to lodge and board its employes, and for a refuge for its passengers; that, on account of the increased business of the railroad, the railroad company made an additional location, which was filed in the office of the secretary of state, and afterwards the complainants applied to the railroad commissioners for a change of the location and, upon hearing before the commissioners, they did cut off, restrict, and diminish the additional location that was made by the railway company, and set out a less quantity of land by metes and bounds to the railway company for its location for side tracks, wood sheds, repair shops, etc.; that, upon further proceeding, the railroad commissioners appraised the damages to the complainants for the land thus taken. They allege that the railroad commissioners are a judicial tribunal established by the laws of the state, and have final jurisdiction for the purpose of annulling or varying a location made by the railroad company, and that the railway company has paid the damages assessed by the commissioners, and claim that the railroad commissioners' location of said additional land was final and conclusive; that said location was not detrimental to complainants' other land beyond the ordinary results of such taking; that the railway company has done nothing by which they have forfeited any rights to the land occupied by them for railroad purposes, or that the additional location is defective or illegal, and they claim that a railroad of the construction of this one is for a railroad of public utility and use, and is entitled to hold land under the power of eminent domain.

Henry Heywood, Oliver E. Branch, Harry Sargent, and Everett Fletcher, for complainants.

On the question of specific performance, the complainants claim that the last lease contained a complete contract in writing signed by all the parties, and in every respect sufficient to comply with the requirements of the statute of frauds; that the provisions of the lease, taken in connection with the evidence, which is always admitted in determining the subject-matter of a contract and in giving an interpretation of a written instrument, shows a full and complete contract on the part of the Mt. Washington Railway Company and Aiken and the Boston, Concord & Montreal Railroad, to whose interest the Concord & Montreal Railroad has succeeded, for the conveyance of the

house and furniture and the laundry and fixtures, as they are all included in the last lease. The exception made in the contract of "such parts of the buildings and improvements within said limits as may be required by said second party (the railway company) for the proper and convenient use of its road, and for its engines, cars, and repairs," has reference to the rights given by the statutes of New Hampshire to the railway company to take land of an individual for railroad purposes; those rights being specified by statute to take land for the roadbed, with necessary additions for excavations and embankments, and such lands as may be necessary for yards, side tracks, wood sheds, repair shops, turntables, gravel pits, engine, car, and freight houses and depots, and for making provisions to supply their buildings and engines with water; that the provisions of the lease in relation to the rights of the complainants to keep the buildings upon the railroad location for such purposes as they had heretofore been used and occupied show that the contract applied to the hotel, and not to railroad buildings; and, also, the provisions in relation to making additions with the assent of the owners, and that Mr. Aiken did make an addition under that provision to the hotel, show that the hotel was the subject-matter of the contract. That the additional location was irregular and void, the complainants rely upon Green's Brice, Ultra Vires, p. 395, note a; State v. Jersey City, 25 N. J. Law, 309; Cassidy v. Railroad Co., 45 Me. 263; Railroad Co. v. Smith, 78 Ill. 96; Platt v. Bright, 29 N. J. Eq. 129; Hazen v. Railroad Co., 2 Gray, 574; Vail v. Railroad Co., 21 N. J. Law, 189; Strang v. Railroad Co., 16 Wis. 666; Railroad Co. v. Munson, 57 Mich. 42, 23 N. W. 455; Railroad Co. v. Wallace, 14 Pa. St. 245; Railroad Co. v. Bruner, 55 Pa. St. 318; Railroad Co. v. Porter, 29 Pa. St. 165; In re New York C. & H. R. R. Co., 90 N. Y. 342. That a railroad of this description was not such a public use as would authorize the acquiring of land by the power of eminent domain, the complainants rely largely upon the case of In re Niagara Falls & W. Ry. Co., 108 N. Y. 375, 15 N. E. 429; St. Joseph Terminal R. Co. v. Hannibal & St. J. R. Co., 94 Mo. 535, 6 S. W. 691; Aldridge v. Spears, 101 Mo. 400, 14 S. W. 118; In re Eureka Basin Warehouse & Manuf'g Co., 96 N. Y. 42. That the court might decree for restitution of unnecessary land taken by the railroad commissioners, the plaintiffs rely upon Dodd v. Railroad Co., 33 Law T. 311; People v. Pittsburgh R. Co., 53 Cal. 694; Edgewood Ry. Co.'s Appeal, 79 Pa. St. 257; Central R. Co. v. Pennsylvania R. Co., 31 N. J. Eq. 475. And that the court had power to set aside and make restitution of such lands as the railroad company did not use, they refer to Neimeyer v. Railroad Co., 43 Ark. 111; Central R. Co. v. Pennsylvania R. Co., 31 N. J. Eq. 475; Webb v. Railway Co., 4 Mylne & C. 119; Eversfield v. Railway Co., 3 De Gex & J. 285.

*E. B. S. Sanborn* and *Frank S. Streeter*, for defendants.

1. The plaintiffs, by contract or otherwise, have no right to purchase the Summit House and fixtures.

2. The present site of the Summit House, being the railway company's original location, cannot be taken by the plaintiffs or assigned to them by the court.

3. The additional location was legally made, and cannot be annulled, in whole or in part, by any just order of court.

4. The plaintiffs are not entitled to an accounting.

5. The maintenance of the Summit House by the railway company has been and is within the lawful powers of the company, and its further maintenance cannot properly be enjoined.

6. The plaintiffs are estopped from claiming that the railway company may not maintain the Summit House as heretofore.

We deny that the Summit House of Mt. Washington is in Sargent's purchase, but, from the testimony of plaintiffs' counsel, and the deeds put into the case, we are obliged to admit that the plaintiffs have a paper title to the summit, which they bought in 1867 of one Aurin N. Chase, whom the plaintiffs hired to procure the passage of a resolution through the New Hampshire legislature for the sale of state's land, whereby they intended to procure, and did procure, for the sum aforesaid this paper title. Whether this title was obtained by the plaintiffs under such circumstances as to divest the state of

New Hampshire of its title to the summit of Mt. Washington and preclude the state from now asserting its right thereto is not properly before this court. That question is for the state authorities. The respondents cannot controvert in this proceeding the plaintiffs' paper title.

I. The plaintiffs. by contract or otherwise, have no right to purchase the Summit House and fixtures. Plaintiffs' right of purchase, if it exists, must be found from the following language in the lease of May 9, 1883: "And if, at the termination of this lease, said first party shall desire to purchase whatever buildings, together with the fixtures and furniture therein, and improvements which may have been made and shall then be on said premises, including also those portions thereof which may be within the limits of the aforesaid road of the second party, excepting such parts of said buildings and improvements within said limits as may be required by said second party for the proper and convenient use of its road, and for its engines, cars, and repairs, * * * the second party shall sell the same to said first party at the value thereof," etc. The plaintiffs' leases did not cover the land on the summit included within the railway location. At the time the last lease was made, the Summit House was the only building inside of the location. By the terms of the lease, the plaintiffs reserved the unqualified right to purchase whatever buildings and improvements may have been made and shall then be on said premises. By the "premises" they meant the leased premises outside of the railway location, and they reserved the unconditional right to buy at their cost whatever buildings lessees might erect during the term outside the original location. Having thus settled the question of the plaintiffs' right of purchase of buildings on the leased lands (outside the railway location), they then dealt with the question of reserving a right of purchasing buildings which the railway company might erect on its own land (within the location), and as to these buildings the railway company did not give, nor did the plaintiffs take, an unconditional right of purchase, but they took the right subject to a very important exception, viz. "excepting such parts of said buildings and improvements as may be required by said second party for the proper and convenient use of its road, and for its engines, cars, and repairs." This exception was general in its terms, and could not be confined to any particular building or class of buildings which the railway company might erect during the term of the lease, provided the company, at the termination of the lease, required the building so erected for the "proper and convenient use of its road." At the expiration of the lease, there were buildings on the leased premises outside the railway location. By the terms of the contract the plaintiffs, if they desired, might purchase these buildings. As to these buildings, there were no conditions attached to the plaintiffs' right of purchase. The Summit House was within the location, and by the terms of the contract, if the plaintiffs so desired, they might buy the Summit House, provided "the railway company did not then require it for the proper and convenient use of its road." The right to determine what buildings were required for such use was not left to the discretion of the plaintiffs or that of the court; it was left solely to the railway company. The parties might have made a different contract, and provided that referees or the court, or some other tribunal, should determine whether the Summit House was or was not required for the proper and convenient use of the road. They did not make such a contract. They agreed that the railway company should exercise its sole discretion upon that subject, and determine for itself what it required. In accordance with the right reserved to it by the contract, the railway company has exercised its discretion, and determined that question. November 1, 1887, the plaintiffs notified the railway company that they desired to purchase all the buildings. December 27, 1887, the railway company served notice upon the plaintiffs that it required said buildings (meaning the Summit House) for the proper and convenient use of its road within the terms of the contract. In giving said notice, the defendants exercised the legal right plainly reserved to them by the contract. By that notice the plaintiffs' conditional right of purchasing buildings within the location on the summit, viz. the Summit House, was terminated.

III. The additional location was legally made, and cannot be annulled, in whole or in part, by any just order of the court. January 3, 1888, the railway

company filed its location "of additional land on said summit of Mt. Washington for side tracks, wood sheds, repair shops, engine, car, and freight houses, turntables, and depot purposes, and all other purposes that are incidental thereto, or may be necessary to carry into effect the object for which the Mt. Washington Railway Company was established." This location covered about five and a half acres of land, and the location, with the plan and survey, was filed in the office of the secretary of state. Proceedings were had under the authority of Gen. Laws N. H. c. 160, § 29. Plaintiffs, being dissatisfied with the additional location made by the railway company, applied to the railroad commissioners for a change, alleging that the railway company "have already sufficient land for all necessary uses, and all that is needed for the management of their railway, but they desire to take the said land for other purposes." It was upon this issue that the hearing before the railroad commissioners was had. After a full hearing, the commissioners made their decision, reducing the boundaries of an additional location as made by the railway company, established new boundaries, found as a fact that the location as fixed by them was necessary to the railway company for side tracks and the other purposes indicated by the statute, and made their return to the office of the secretary of state. Upon the return of the additional location, the plaintiffs were bound to apply to the court to annul the judgment, or to acquiesce in the judgment. Instead of attacking the judgment, they acquiesced in and assented to it. They do not charge the railroad commissioners with fraud or corruption, but admit the contrary. On the day the return was filed by the commissioners, the railway company applied to them to appraise the damages to the plaintiffs for the taking of the land. Hearing was had, at which all parties were present. The damages were awarded, and the plaintiffs took their appeal, not from the judgment determining the boundaries of the location, but from the award of damages for the land taken.

The necessity or propriety of appropriating private property for the use of the public or of the government is not a judicial question. The power of determining such necessity or propriety resides exclusively in the legislature. There is no restraint upon the legislative power except that requiring compensation to be made. The legislature may conclusively prescribe the methods by which the power shall be exercised, may appoint proper tribunals to determine (1) the necessity for the taking for any particular public use; (2) the amount or quantity to be taken; (3) the compensation to the owner for the property so taken. The legislature may provide an appeal from the judgment of said tribunals upon any one or more, or all or none, of the three questions; it may provide that the judgment of said tribunals shall be final and conclusive upon either or all of the three questions. The statute (Gen. Laws, c. 160, § 29) provided that railroad corporations may take and hold such land as may be necessary for side tracks, etc., and that, if the owner is dissatisfied with such location, either party may apply to the railroad commissioners, who may change the same as justice may require. From the decision of the railroad commissioners determining the necessity for the taking and the amount of land to be taken, and changing the location, as justice may require, no appeal has been provided by the legislature. Upon this question, the judgment of the railroad commissioners is final and conclusive; that judgment has the same validity and is as binding upon all the parties interested as any judgment of this court in a case where it has final jurisdiction of the subject-matter and the parties. The legislature might have provided for an appeal by either or both the parties interested, but it has not done so. If the judgment of the railroad commissioners in determining the amount of land to be taken, and the boundaries thereof, is unsatisfactory to the railway company they have no remedy; they are bound by the judgment, and cannot take any land outside of the boundaries prescribed by the commissioners. If the judgment of the railroad commissioners is unsatisfactory to the landowner, he has no remedy; he must submit to that judgment, but may recover full compensation for all land taken. It will be observed that the rights of the landowner are fully protected. He cannot appeal from the determination of the commissioners as to the amount of his land necessary to be taken; but upon the question of proper compensation for the land taken he may appeal, and have that compensation de-

termined by a jury. The judgment is final. Railroad Co. v. Speer, 56 Pa. St. 325; Struthers v. Railroad Co., 87 Pa. St. 282; Farnham v. Canal Co., 61 Pa. St. 265; Chambers v. St. Louis, 29 Mo. 543; Land v. Coffman, 50 Mo. 243; Hill v. Railroad Co., 32 Vt. 68; Swan v. Williams, 2 Mich. 437; Chicago, R. I. & P. R. Co. v. Town of Lake, 71 Ill. 333; People v. Smith, 21 N. Y. 595. I therefore submit that both parties are concluded by the judgment of the commissioners of September 11, 1883, which fixed the limits of said additional location, and determined the fact that the land within said limits was necessary for the legitimate use of the railway company. Plaintiffs, pursuing their statutory remedy, applied to the railroad commissioners to change the location, claiming that the railway company had already sufficient land for all necessary uses, and that they desired to take the land for other purposes. These issues were tried, and finally adjudicated. The plaintiffs had their day in court. That adjudication was final; it cannot be reopened here.

V. The maintenance of the Summit House by the railway company for station purposes, and as a place of entertainment for its patrons, and for furnishing them food, lodging, and shelter while at the summit, is within the lawful powers of the railway company, and its further maintenance cannot be properly enjoined.

The Court: That is a question for the attorney general of New Hampshire, not for this court.

PUTNAM, Circuit Judge. This is a very important case, and involves a large mass of facts; but the principles which govern it are to my mind simple, and, therefore, I think I had better dispose of it now. I am satisfied that, if I should delay the decision for the purpose of investigating, pending the investigation, which would necessarily be delayed somewhat, I should lose from my mind more than I should acquire.

Something has been said touching the title of the complainants, but it does not seem to be seriously contested. So far as the record goes, the complainants have been in possession since 1862, and are now in possession, subject to the interests of the Mt. Washington Railway Company and the other respondents, and no one disputes their title, so far as I can discover. For all the purposes of this case, and for the carrying out of the contract here under consideration, the title is certainly sufficient; and if not, yet, so far as this case is concerned, the respondents are estopped by the contract from disputing it.

The objections of complainants to the last location made by the railway corporation are threefold: (1) That the purposes for which this railway was constructed are not such as to make a public use within the meaning of the constitution; (2) that the location, as modified by the railroad commissioners, should be set aside, in whole or in part, for reasons which I will refer to later on; (3) that the location is defective on account of a confusion or error touching the point from which the first call in its description starts.

As to the first objection, the amended bill prays the court to set aside the location on the ground that the railway corporation has no power under the constitution to take lands by eminent domain. If I should grant that request, the decree which would be rendered would necessarily pull up the contract by the roots, as its whole scheme is based on the reverse idea. There is an inconsistency in asking relief on the contract, and at the same time deny-

ing that this corporation can avail itself of the right of eminent domain. So long as the complainants stand upon the contract, they are estopped, at any rate in any litigation in which they set it up, from obtaining relief on the other ground. I need not go further, although I have very positive views in harmony with the general position of the respondents, if I found it necessary to express them.

With reference to the second objection, there is no doubt in my mind that a court of equity may set aside the action of a tribunal of this character, either in whole or in part, if it is fraudulent in its nature or essence, or was fraudulently obtained. It may even go further, and, for the same reasons, set aside the judgment of a judicial tribunal. This is a fundamental principle of equity law. But it is not enough for that purpose that the parties who brought about the adjudication had a fraudulent or illegal intent. It must be shown that the tribunal itself proceeded fraudulently or in excess of its powers, or that it committed a gross mistake, or that the adjudication was obtained by fraudulent methods practiced upon or before the tribunal, as by false testimony. It is a well-settled principle that a just result, otherwise lawful, is not ordinarily affected by the fact that the parties who secured it entertained in their own breasts an illegal, fraudulent, or unauthorized intent or purpose. The law ordinarily judges of what was done by what was done, and not by the purposes of those who secured the result. Courts proceed very grudgingly in setting aside adjudications of other tribunals, and within very narrow lines, and only in a clear case. The reason is evident. If the proceedings of the first tribunal may be attacked for loose or general reasons, the proceedings of the second tribunal may be attacked for the same reasons, and there would be no end to litigation. The proofs in this case fail to meet these requirements. But the proposition is also made that the railroad commissioners have gone beyond their powers, and laid out more land than was required for any legitimate railroad uses. I have no doubt that, aside from the usual questions of fraud, excess of power, or gross mistake, and from the other usual grounds of interference by courts of equity with the action of judicial or quasi judicial tribunals, nothing but the final decision of the ultimate judicial tribunal can absolutely prevent a landowner from raising the question whether or not property taken was needed for public uses. But upon that question every reasonable intendment is made in favor of the party exercising the right of eminent domain. The various constitutions provide that this taking for public uses shall be compensated for. But the requirement that property taken for public uses shall be compensated for gives the owner his substantial protection, without going further and establishing nice rules as to the quantity to be taken. The nature of the use for which land is to be taken necessarily appears on the face of the proceeding; and, if it is not a public one, the condemnation cannot be sustained, no matter what the legislature may have declared. The constitution of New Hampshire makes no express limitation touching the amount of property which shall

be taken for public uses, all other conditions being complied with; and, as I have already said, the courts on this point have been very liberal towards the party exercising the right of eminent domain, and have given him the benefit of every reasonable intendment. For example, the statute right of way for railroads in this state is 99 feet in width. Now, if a railway corporation in any particular case took that amount of land, and the question was raised whether or not it was more than it actually needed, the objection would receive from the courts no consideration except of the most grudging character. That is, the declaration of the legislature that a railroad corporation may take a right of way of 99 feet in width has been practically construed as giving the right to take that entire width, so far as the corporation desire it, without any question whether or not it could at any particular point construct its road, and maintain it with less. The general proposition is strengthened in this case by the fact that an adjudication—whether a strictly judicial one or not it is not necessary for me to say—has been made by the railroad commissioners, who have viewed the premises, and who, under all the circumstances, are more capable of determining what is required by the railway corporation, not only for the present, but in the reasonable future, than a court of law. A judge, sitting as I am sitting here, ought not to review the action of a tribunal of that character on such a matter, except the evidence is clear that the commissioners made a gross mistake. The case here, moreover, shows distinctly that the corporation did need land outside of its first location. Its engine house, turntable, and storage tracks were and are necessarily outside of it; and evidently, if the present hotel was removed, the railway corporation could not be accommodated within its original limits and yet build such a station as it would require for its ordinary passenger service. There was therefore, on the face of this case, an evident necessity for the corporation to take advantage of the statutory provisions under which it proceeded to make this additional location. And there are circumstances enough in this case, giving the evidence for the complainants full force, and wholly disregarding the evidence for the respondents, to show that the railroad commissioners made no such gross mistake as to authorize the court to annul their action in whole or in part. The complainants recite in the bill that the railroad commissioners proceeded on the hypothesis that the railway corporation was entitled to take land for hotel purposes. I do not find anything in the proceedings of the commissioners which justifies that suggestion. In the face of the fact that they report that the land was taken for the purposes the statutes authorize it to be taken for, and without evidence that they in any way expressed themselves otherwise, I do not perceive that this proposition can be sustained. To go back to a principle already stated, the fact that the railway corporation desired a part of this land for hotel purposes, if it did so desire it, or that it desired for special reasons to exclude the complainants, if it did so desire, will not invalidate the action of the commissioners unless it is also shown

that the desire received form and practical effect in the action of the commissioners themselves; because, as I have already stated, the fact that a party who has the legal right to proceed in a certain direction, and reach a certain result, also desired to reach that result for reasons not within the scope of the law, does not ordinarily affect it, if it is otherwise valid. For the reasons stated, I cannot annul the action of the commissioners, in whole or in part, on the ground of the second objection.

Coming to the proposition that the report of the commissioners is erroneous with reference to the beginning of the first course, all I need say about it is that, if the location made by them was uncertain in law,—not merely in fact, but in law,—it could not stand; but that it is uncertain in fact, that individuals may differ in regard to its construction, and that it must go to the courts to ultimately settle its boundaries, do not make it uncertain in law, as the law says that what can be made certain is certain. The report cannot be set aside on that ground. There is some question, no doubt, as to the proper construction of the report, but that I think I will be able to dispose of so far as this case is concerned without difficulty. I do not propose to leave this matter in such form that the proceedings in this court shall go forward on a theory favorable to the complainants, and yet the damages be assessed by the state courts on another theory unfavorable to them.

I see nothing in the new location which prevents carrying out the essence of the contract, because the contract expressly provided that it should be executed on the old location; and the fact that the new location does not any more interfere with its practical execution than did the existence of the original right of way. The parties have submitted many propositions based on the apparent theory that we are to determine the ultimate rights of railway corporations, and of abutters and landowners, with reference to land taken for railroad uses. There may be cases where contracts are of such a nature, that the court sees that their enforcement according to their terms would prevent a railway corporation from performing its duty to the public; and then the court might hesitate, and, perhaps, refuse to proceed, although ordinarily, as has been stated during the hearing, equity courts do not take the place of the attorney general, for the purpose of seeing to it that corporations perform their duties to the public. We may suppose an instance where a railway corporation has, upon its admitted right of way, erected structures which the landowner claims it has no right to erect and maintain; and, a controversy arising on that point, the parties in interest might well adjust and compromise the question, and agree, under such circumstances, that the corporation shall for a certain length of time retain the use of the buildings, and that afterwards the landowner shall take possession of them, leaving them where they are for another certain length of time, and then removing them on certain conditions stipulated. An agreement of that nature should be enforced by the courts, unless they see that it necessarily interferes with the performance by the cor-

poration of its duties to the public. Whether or not the parties in this case were in that position, it is not necessary to say; but the pith of the contract in question is to that effect, and as though it had reconciled and compromised many of the questions argued before me, in a way which, in my judgment, does not affect the public necessities, and does not prevent the railway corporation from performing its duties to the public. I see no difficulty whatever, therefore, in carrying out the contract substantially as the parties to it have agreed.

The question next arises, to what does the contract appertain? The court finds here two propositions of importance. The first is whether the exception of the buildings needed for railroad uses, is limited to those that are or were within the original location, and the other is based upon the claim of the respondents that the corporation is to determine what buildings are thus required. In the latter connection the respondents say that whether or not the buildings were required for railroad purposes, was to be determined according to the condition of things at the termination of the lease. I agree to this; and I also hold that whether or not an excepted building is within or without the limits referred to in the contract, relates to the same period of time. As all buildings which, in my judgment, are needed for railroad uses are within the limits of the location as it now exists, I do not consider that the railway corporation is required to turn over to the complainants, or that the complainants are required to receive, any of the buildings intended for strictly railroad uses, whether within or without the original right of way. I refer here to the phraseology, "excepting such parts of said buildings and improvements within said limits, as may be required by said second party for the proper and convenient use of its road, and for its engines, cars, and repair shops." Even if this clause is restricted to the time when the lease was made, so that the "limits" are those of the original location or right of way, yet, taken in connection with what follows in the lease,—that the buildings and improvements to be taken by the complainant shall be used for hotel purposes,—it is very clear, reading the whole contract together, that it was not the intention that the complainants should take, or that the respondent railway corporation should deliver, any building intended strictly for railroad purposes, wherever situate. The respondents say that the word "required" is equivalent to the word "demanded" or "desired," and that the railway corporation is the ultimate judge of what buildings were to be reserved for railroad uses. Taking the whole contract together, my view of it is that, whatever particular word or particular expression may be found in it, it appears plainly that the complainants were to have the hotel, and that, whatever else was to be retained by the railway corporation, this certainly was not. But I do not rest the case there. I will follow to some extent further the view taken by the respondents and the interpretation put by them on the word "required." According to well-settled principles of construction, the word, whatever its meaning, is to be limited by the word "fairly," —"fairly required." And the fact that, since this controversy arose,

the respondents have leased the hotel property to be run substantially as the complainants must run it, if they take it, shows conclusively it was not thus "fairly required." So far as the record shows, it can be and will be used in the future for hotel purposes, railroad purposes, and other purposes, by the complainants, precisely as it has been used in the past under the arrangements which the respondents themselves have made; and the carrying out of the contract will not alter its status with reference to railroad uses and public necessities and convenience. In this position I am especially strengthened by the fact that, on the construction I put on the new location, the hotel buildings are not taken by it, and have been allowed to continue the property of private individuals (respondents in this case). I therefore see no difficulty whatever, arising either from the changed condition of affairs through the new location or from any present public necessity, which stands in the way of the carrying out of this contract according to its spirit and its letter, and I shall order a decree to that effect. I shall, however, provide in the decree that the railway corporation shall be allowed such uses of the platform, and of any portions of the general public rooms of the hotel, for the sale of tickets, or as a resort for its employes and passengers, as has been customary in the past, and in that way follow both the spirit of the contract and its letter, as it provides that the railway corporation shall retain such buildings or "parts" of buildings as are required, and so on. There will be no difficulty in framing a decree upon this point, having full regard, as it must have, to what has been the custom in the past.

I shall decree that the complainants have the use of both locations for the purposes which the contract describes, for five years from November 1, 1889, which I understand to be practically the termination of the old lease. It expired in 1887, but was continued by verbal arrangement and sufferance until 1889; and everything will run from that date.

I can conceive of no way in which equity can be done between these parties, without acceding to the prayer for an accounting; and I shall decree that the respondents account for the profits on the lease from November 1, 1889, to the time when the master makes up his report, and that the complainants be charged with interest from November 1, 1889, on the amount of the value of the hotel, fixtures, and furniture. The equities, as between the several respondents, touching the items of profit on the lease and interest, will be reserved for consideration after the coming in of the master's report; but that the master will ascertain and report in relation thereto such facts as any of the respondents request. I cannot direct the respondents to set aside any land to which the hotel may be moved; but I shall direct the master, in making his appraisal, to take into account the changed condition on the summit of the mountain, and if he finds that, on account of the new location, it will be impossible for the complainants to move this hotel upon any practical lot on the summit, he must take that into consideration in determining the value at which the complainants shall take the property. I shall also direct him to inquire whether the com-

plainants, before the new location was made, had practically a monopoly of the summit of the mountain for hotel purposes, except this precise location where the hotel now is, and are now deprived of that monopoly, and to give the facts found in reference thereto such weight as they should have in determining the value of this hotel, fixtures, and furniture. I am somewhat embarrassed as to the parties who should account; but, on the whole, I am of the opinion that, inasmuch as all the respondents entered into the last lease to Mr. Barron, and have thus all co-operated in denying possession to complainants, they are all liable for whatever profits the master may report.

I am somewhat embarrassed by the relations between the railway corporation and the owners of the hotel. The interest of the latter may be diminished in value by the fact that the former has made this additional location. For the purpose of carrying out that part of the contract, which provides that the railway corporation account to the owners of the hotel for their fair interests under an appraisal, I shall direct the master to find what amount shall be allowed by the former to the latter by reason of depreciation, if any, in valuing the hotel, fixtures, and furniture, on account of there being no convenient lot to which it can be removed, if such be found to be the fact. I do not mean to say that there is no convenient lot to which to move the hotel. I have no opinion about it. I shall simply direct the master to ascertain whether such is the fact, and, if such is the fact, to find as already stated. I shall direct the master to permit the respondents to file with him an offer of release of any portion of this location they deem proper to release, to which the hotel may be removed, and to accompany the same with the release duly executed; and thereupon to give the owners of the hotel property the benefit of the increased value, if any, which would come to it by reason thereof. I shall direct the master to permit the respondent railway corporation to make the new location certain as to the point of beginning and otherwise, and to prove that they have executed and filed proper papers therefor; and, in default thereof, that the master shall assume, for the purposes of this case, that it commences at the bolt midway of the stage office. In any event, I shall direct him to assume, for the purposes of this case, that the new location is valid. I shall direct that no final decree be entered in the case until the court is fully advised, and counsel have been heard, touching the injunction granted by Judge Allen in the state court. I will be prepared to consider any further provisions to go into the decree, which may be suggested by counsel on either side, which will tend to work out the equities of this case. It is, perhaps, impossible for me to foresee all the equities which may be disposed of by the master, and I therefore reserve the right to add such further orders as it may appear ought justly to be inserted. The decree for accounting should go against the Concord & Montreal Railroad Company, the Mt. Washington Railway Company, and Walter Aiken, but not against the Boston, Concord & Montreal Railroad Company. The complainants may file a draft decree based on these

notes, on or before rule day in October, and the respondents may file corrections thereof on or before rule day in November. For the present, the court will enter the following order: Decree for specific performance and master, according to notes on file. Draft decree to be filed by complainants on or before October rules. Corrections to be filed by respondents on or before November rules.