ALBANY POWER &c. COMPANY *v.* CITY OF ALBANY.

The contract upon which plaintiff's suit was founded did not authorize the construction placed upon it in the petition; and the allegations upon which a recovery was sought failing to show a right of action against the defendant, there was no error in dismissing the suit upon general demurrer.

Argued May 5,—Decided October 12, 1909.

Complaint. Before Judge Spence. Dougherty superior court. October 5, 1908.

The Albany Power and Manufacturing Company, which, for the sake of convenience, will hereinafter be called the power company, instituted suit against the City of Albany, hereinafter called the city, for the recovery of $1,020 and interest, alleged to be due under a contract between the power company, as party of the first part, and the city, as party of the second part. The contract provided as follows: "I. That said party of the first part, for and in consideration of the payments hereinafter agreed to be made by said party of the second part, hereby covenants and agrees to furnish to said party of the second part, for the full twenty-four hours of each and **every day** during the life of this contract, three hundred electrical horse-power of a frequency of sixty cycles, at twenty-three hundred volts potential for the lighting circuits and a satisfactory potential for the meters; to furnish such power in addition to said three hundred horse-power, for the full twenty-four hours of each and every day during the life of this contract, as said party of the second part may require for its own purpose, and not subject to be sublet by said party of the second part, at the same rate

per horse-power and upon the same terms as hereinafter provided; to deliver all of aforesaid power to said party of the second part at its electrical light and water station on North street in the City of Albany, the amount of said power so delivered to be shown upon the meters at the said station of said party of the second part as aforesaid; to furnish all poles, wiring, or other apparatus necessary to transmit the power herein contracted for from the plant of said party of the first part to said station of the party of the second part, which latter shall be the place of connection; and to furnish at said point of connection such transformers as may be necessary to reduce the pressure to the voltage now used at the plant of the party of the second part, as herein contracted for; and to maintain at all times service, which shall be entirely satisfactory for incandescent lighting, in order to secure which the maximum voltage variation at the aforesaid point of connection shall not at any time exceed 3 per cent. of the normal voltage, this variation to be determined by curve drawing voltmeter placed at aforesaid point of connection; to operate, in the event of its inability to furnish power to the party of the second part from its plant on account of flood, backwater, breakdowns, or from any other cause whatsoever, the present steam plant of the party of the second part, during such times as it is unable to furnish power from its own plant, paying the expenses of fuel, engineers, firemen, and labor incident to the operation of said steam plant, and without expense to the said party of the second part. II. That the party of the second part, in consideration of the faithful performance by the said party of the first part of its agreements as hereinbefore set out, hereby covenants and agrees to pay, during the life of this contract, to said party of the first part, the sum of $8,000.00 per annum for 300 horse-power, payments for same to be made in quarterly installments of $2,000.00 at the end of each quarter, and to pay said party of the first part at the same rate and upon the same terms for such additional power as may be furnished to and used by said party of the second part, and as hereinbefore contracted for. III. It is mutually agreed by and between the parties to these presents that the wiring and electrical equipment on the premises of the electric-light plant and water station of said party of the second part, to the point of connection with the system of said party of the second part, shall be maintained in a condition satisfactory to

the party of the second part and the inspection department of the party of the first part, and it is further agreed that no change or alteration shall be made in the number of horse-power of the meters, or in the wiring or equipment of the above-named premises, without first giving written notice to the party of the first part. IV. It is further mutually agreed, that, during such hours as the party of the second part may not require the 300 horse-power as herein agreed to be furnished, for the operation of its electric-light and water plants, said party of the second part may utilize any excess over the amount it is actually using and up to the 300 horse-power in supplying with power small meters in the City of Albany, said meters not to exceed 10 horse-power each. V. It is further mutually agreed that this contract shall be for a term of 17 years, and shall become effective as soon as the power plant of the party of the first part is finished and is in a position to furnish the power herein contracted for, provided it shall not be later than October 1st, 1905; and provided further, that the within contract shall be authorized at an election by the qualified voters of the City of Albany, as required by provisions of article 7, section 7, paragraph 1, of the constitution of the State of Georgia. VI. It is further mutually agreed that before this contract shall become effective that said party of the first part shall furnish to said party of the second part, subject to its approval, a bond in the sum of $15,000.00 in some good and solvent surety company authorized to do business in the State of Georgia, conditioned to hold said party of the second part harmless against any loss that it may suffer by reason of a failure on the part of said party of the first part to install its plant or to furnish the power as herein contracted for."

The suit arises out of the difference of construction placed upon the contract by the respective parties. Under the allegations of the petition, which portray the construction given the contract by the plaintiff and set forth the facts upon which the action is founded, are the following: "3. The said contract is a flat-rate contract for electric current, payable two thousand ($2,000.00) dollars quarterly for not exceeding 300 horse-power, whether used or not. 4. No rate per unit of energy is stipulated in said contract, and the flat-rental rate of two thousand (2,000.00) dollars per quarter, based on the minimum of 300 horse-power, whether actually supplied and used or not, applies to all excess power at any time re-

quired by defendant for its own purposes.   5.   When a maximum requirement is fixed by defendant, plaintiff is bound by the terms of said contract to furnish same 'for the full twenty-four hours of each and every day during the life of this contract.'   6.   The maximum of power which plaintiff is bound to furnish is not specified in said contract, further than that it shall be such an amount as the city requires for its own purposes.   7.   The said contract provides that the demand thereunder for power by defendant shall be automatically determined and readjusted from time to time according to the actual experience of defendant in the prosecution and performance of its municipal activities requiring electric-power current for its own purposes.   8.   Under said contract all 'power in addition to said three hundred horse-power' must be paid for by defendant to plaintiff 'at the same rate and upon the same terms' as the initial 300 horse-power is paid for.   9.   The highest amount of power required by defendant for its own purposes under said contract, prior to January 1st, 1908, was 453 horse-power on the 23rd day of December, 1907.   10.   Plaintiff alleges that this highest amount, hereinafter called the 'peak load,' fixed the basis on which plaintiff was entitled to be paid for power under said contract until a higher amount or new peak load was required.   11. Plaintiff alleges that said peak load fixed the basis of compensation for power furnished under said contract for the first quarter of 1908, as aforesaid, no higher peak load having been reached during said quarter.   12.   The amount due plaintiff by defendant for power furnished under said contract for the first quarter of 1908 is that sum proportionately as much greater than two thousand ($2,000.00) dollars as 453 horse-power is greater than 300 horse-power, to wit: three thousand and twenty ($3,020.00) dollars.   13. At the end of the first quarter of 1908, the defendant paid plaintiff two thousand ($2,000.00) dollars on account of the amount due plaintiff for said quarter, but refused to pay the balance above claimed as due by the plaintiff, under said contract.   14.   Plaintiff alleges, that, after crediting said two thousand ($2,000.00) dollars as aforesaid, the balance of one thousand and twenty ($1,020.00) dollars, for which this suit is brought, is entitled to draw interest at lawful rate from April 1st, 1908; and plaintiff prays judgment accordingly."   In aid of its construction of the contract the plaintiff filed an amendment to the petition, alleging as follows:

"Defendant owned a municipal water and lighting plant. In addition to lighting its own streets and supplying water through its mains and hydrants for fire protection and sanitary purposes, it sold water and light to its citizens for their domestic, business, and industrial uses, and received established rates for such light and water. By means of the contract sued on, defendant sought to continue first-class service for the purposes above enumerated, through the instrumentality of the power to be furnished by plaintiff under said contract. At the time said contract was made the plaintiff owned an undeveloped water power near the City of Albany, and desired to obtain a long-term contract with defendant of sufficient magnitude and profit to justify the investment for its development. Both plaintiff and defendant recognized and undertook to provide for the continuous readiness to serve power such as municipal needs of Albany above outlined should require. With equal prominence it was obvious to both parties to said contract that the same amount of power would not be required during each and every hour of the day, and that as the city grew in population the maximum amount of power required would increase and the limits to the maximum thus changing were fixed solely by the needs of the defendant for its own purposes and uses. Thus confined, the increased demand would be reasonably indicated by the obvious growth of the city, and the plaintiff could with certainty prepare to meet the increased demands upon it which defendant had the right to make. Had the city continued to supply light and water from its own steam plant, it would have had the same criterion to guide it in enlarging the capacity of its said plant. Such a plant would have been inadequate did it fail to meet the extreme demand upon it; and if able to meet it once, it could of necessity remain able to meet it until a new maximum was established. To substitute for such a plant the contract sued on was made, and by means of this contract the defendant is saved the investment necessary to enlarge its plant to meet its municipal necessities for the remainder of the seventeen-year term of said contract. At the time said contract was negotiated the load factor of defendant in supplying its own power was forty per cent. By load factor is meant the ratio between the average demand and the maximum load required." General demurrer was filed to the petition as amended; and upon its being sustained the plaintiff excepted.

*Smith, Hammond & Smith* and *J. H. Hall,* for plaintiff.
*James Tift Mann* and *L. Z. Rosser,* for defendant.

ATKINSON, J. It was contended by the plaintiff that inasmuch as the city on December 23d used 147 additional horse-power over 300 horse-power, that being the greatest amount of excess power used at any time before the beginning of the quarter commencing January 1st, it was obliged for the quarter so ensuing to pay for that amount of excess horse-power, whether actually furnished to and used by or required by the city or not; it being contended that the maximum excess of horse-power used at any time during the month of December constituted a basis for and fixed the amount of excess power, so that its character should be changed from that of excess power and treated as an enlargement of the 300 horse-power specified in the contract, which the city was flatly and unconditionally bound to pay during the ensuing quarter. It was upon the theory that the city would be so liable that the suit was brought, and the amount sued for is alleged to be the cost of excess horse-power, not claimed to have been actually furnished, but for which the city was bound to pay under the contract, though not actually used or required. Counsel for plaintiff and defendant in their briefs take different views of the contract, but agree that the decision of the court must depend upon how the contract should be construed. If the construction should be according to the plaintiff's interpretation, as above outlined, the petition was not open to general demurrer; otherwise, if not so to be construed. The question is not whether the defendant has construed it correctly, nor upon a construction of the contract generally, but is solely whether the construction insisted upon according to the allegations of the plaintiff's petition is authorized by the terms of the contract. In other words, the plaintiff based its claim upon a state of facts which would render the city liable only in the event the contract obligated the city as the plaintiff, by its construction, contended that it did; and if that construction were not well founded, the case would fail. A careful examination of the contract as a whole will show that the obligations of the power company to furnish and of the city to pay for excess or additional horse-power over 300 horse-power are contained wholly in paragraphs 1 and 2 thereof. The paragraphs are to be construed together. Paragraph 2 provides that the city shall pay for 300 horse-power at the rate of $8,000 per annum, payments

to be made in quarterly installments of $2,000 each at the end of each quarter; and also that the city was to pay "said party of the first part at the same rate and upon the same terms for such additional power as may be furnished to and used by said party of the second part, and as hereinbefore contracted for." The words, "and as hereinbefore contracted," as here used, can have no meaning or reference to paying anything, except to meet such obligation as would result from the performance by the power company of the stipulations contained in paragraph 1 of the contract. Nothing else had been "hereinbefore contracted." The stipulations in paragraph 1 of the contract called for a performance by the power company, and related only to the furnishing of power by the company to the city. In addition to 300 horse-power stipulated to be furnished without condition, it was further stipulated that the power company would "furnish such power in addition to said 300 horse-power, for the full 24 hours of each and every day during the life of this contract, as said party of the second part may require for its own purpose, and not subject to be sublet by said party of the second part, at the same rate per horse-power and upon the same terms as hereinafter provided." The stipulations of the city agreeing to pay, as expressed in the excerpt hereinabove quoted from paragraph 2, refer to payment for all such horse-power as the power company was bound to supply under the provisions of paragraph 1. But the excerpt above quoted from paragraph 1 is not to be understood as an unconditional stipulation to furnish an additional or excess horse-power over and above 300 horse-power. The words there used, "as said party of the second part may require," qualify the words which precede them. To have eliminated these qualifying words would have left the quantity of excess horse-power to be furnished somewhat indefinite. Without such words the stipulation would have been merely for additional horse-power. Inserting the words, "as said party of the second part may require," rendered the contract less uncertain. With these words so employed, the limit of excess horse-power which the power company may be compelled to furnish at the stipulated price would be such an amount as the city may require for its own purposes; while, by the stipulations of paragraph 2, the city was bound to pay for all the excess horse-power, it had the right, under paragraph 1, to have the power company furnish it. We do not see that it can be compelled to pay for any more.

The plain words of the contract, given their ordinary meaning and significance, preclude the idea of the existence of an obligation upon the part of the city to pay for additional horse-power which it did not require, or "which was not furnished to ," or "used by it." Nor was there anything in the character of the business or conditions attending the parties at the time of the making of the contract, as set forth in the amendment, which would impel the construction contended for by the plaintiff. The word "require," as used in different contracts, has been construed in a number of cases. See Miller *v.* Leo, 35 App. Div. 589 (55 N. Y. Supp. 165-7) ; Mueller *v.* United States, 19 Ct. Cl. 581; McKeever *v.* Canonsburg Iron Co., 138 Pa. 184 (16 Atl. 97-98) ; Wheelhouse *v.* New Liverpool Gas, Light & Coke Co., 5 Man. G. & S. 798-806; Coe *v.* Aiken, 61 Fed. 24. Under the constructions placed on expressions somewhat similar to the language employed in paragraph 1, "such as the said party of the second part may require for its own purpose," it would seem that the word "require," when so used, would refer to such a reasonable amount as the reasonable exigencies of the municipal service might call for. But it does not seem important, in the present case, to attach any particular significance to any shades of distinction in the various interpretations of the word as here employed, because the plaintiff's claim does not rest upon the fact that the city requested or demanded the additional horse-power sued for, or that the exigencies of the public service required an actual use of the additional 147 horse-power at any time during the quarter for which it is alleged in the suit the claim is made. Relatively to the amount of excess over 300 horse-power to be furnished, is was the theory of plaintiff that the contract acted automatically, and, if at any time the city should use a given amount of excess power over 300 horse-power, the automatic character of the contract bound the city continually thereafter, for the full 24 hours of each and every day during the life of the contract, to pay for that quantity of excess, although the full amount may not be furnished to or used by the city, and it may not have required the same for its own purposes; that the amount of excess thereafter to be paid for could only be changed in one way, that is, by increasing it, which could be accomplished by another automatic change of the contract brought about by some subsequent use of a greater amount of excess horse-power than had theretofore been used or required. In

the plaintiff's petition the highest amount of excess horse-power used is referred to as the "peak load," and it was declared that any one "peak load" fixed the basis of payment until another was established. Under this theory it is possible that in the early stages of the contract an emergency might arise by which additional horse-power would be required by the city in double the amount that it would under ordinary circumstances require, and far greater than it might need under any other emergency after that. The maximum quantity thus established would have to be supplied and paid for during the many remaining years of the contract, although the power company might find great difficulty in supplying it, or the municipal necessities might not in any manner demand it. It is hardly probable that the parties intended to lay the foundation for any such unreasonable possible result. But leaving out of view the possibility of any such result, we think the language of the contract prevents any construction which would support the theory contended for. *Judgment affirmed. All the Justices concur.*