[L. A. No. 3750. In Bank.—December 9, 1916.]

## STRAND IMPROVEMENT COMPANY (a Corporation), Respondent, v. CITY OF LONG BEACH (a Municipal Corporation), Appellant.

DEDICATION—CITY OF LONG BEACH—PUBLIC USE—CONCLUSIVENESS OF JUDGMENT QUIETING TITLE AGAINST CITY.—In this action involving the ownership of a parcel of land in the city of Long Beach situated on the sand beach above the line of ordinary high tide, and claimed by the city under an alleged dedication to public use by a former owner, it is held that a judgment in a prior action quieting the title of the plaintiff's predecessor in interest against the city's claims for public purposes or otherwise, which was rendered in pursuance of an agreement for the settlement of that action, is conclusive upon the city and upon the public that the land is free from public use.

ID.—CONSENT OF ATTORNEY TO JUDGMENT—PRESUMPTION OF AUTHORITY. In the absence of any evidence of fraud or of want of authority

of the city's attorney, the authority of such attorney to consent to the rendition of such judgment against the city is presumed.

ID.—GRANT OF TIDE-LANDS TO CITY OF LONG BEACH—LINE OF MEAN HIGH TIDE.—The act of May 1, 1911 (Stats. 1911, p. 1304), whereby the state granted to the city of Long Beach, "all the tide-lands and submerged lands, whether filled or unfilled, within the present boundaries of said city, and situated below the line of mean high tide of the Pacific Ocean," in trust for purposes of navigation, is a present grant and refers to conditions then existing, and does not convey to the city any land then situated above the mean high-tide line.

ID.—LAND ABUTTING UPON OCEAN—ACCRETIONS BELONG TO OWNER.— The right of an upland owner to additions to his land by alluvion or accretions exists in this state where the land abuts upon the ocean. Section 1014 of the Civil Code has no application to alter the common-law rule in that respect.

APPEAL from an order of the Superior Court of Los Angeles County refusing a new trial. Walter Bordwell, Judge.

The facts are stated in the opinion of the court.

Stephen G. Long, W. H. Jamison, Anderson & Anderson, George L. Hoodenpyl, and Wilber F. Downs, for Appellant.

Call, Variel & Call, John E. Daly, Joseph H. Call, H. M. Barstow, Daly & Daly, and Williams, Goudge & Chandler, *Amici Curiae,* for Respondent.

SHAW, J.—The defendant appeals from an order denying its motion for a new trial.

The case concerns the ownership of a parcel of land in the city of Long Beach situated on the sand beach above the line of ordinary high tide, and between that line and a bluff a few hundred feet north of it, near the ocean front. Two main questions are presented by the appellant in opposition to the claims of the plaintiff. The first question is whether or not the particular tract in controversy was dedicated to public use as a street, park, or pleasure ground by the former owners of the property and is still subject to such use. The second question is whether or not the doctrine that land added to the upland by accretion, or alluvion, applies to land bordering upon the ocean.

1. The asserted dedication to public use is based on a map filed for record in 1882 by the former owners, showing a survey and subdivision into blocks, lots, streets, and alleys of a large tract of land now comprising a part of the city of Long Beach. The land was a part of a Mexican grant patented by the United States and known as Rancho de Los Cerritos, bounded on the south by the Pacific Ocean. The southern boundary of the map was a reproduction of the meander line of the United States patent, surveyed to indicate the approximate position of the line of ordinary high tide forming the real boundary of the rancho. The line of actual high tide was not shown. Between this meander line and the southern lines of the tier of blocks nearest to it, the map showed a space of irregular width, varying, according to the map scale, from two hundred to three hundred feet. Along this space there was a crooked line from one hundred and twenty to two hundred feet, by the scale, south of the south lines of the first tier of blocks. The map did not contain any legend or words denoting the purpose of this line. There was parol evidence that it was intended to indicate the line of a bluff fifteen to twenty feet high extending along the ocean front north of the land in controversy. In the space between this bluff line and the tier of blocks there were the words "Ocean Park Avenue." Nothing further appears that tends to define the width of the space intended to be embraced in Ocean Park Avenue, except a note on the margin that "All streets running east and west are 80 ft. wide." As all the other east and west streets are denominated "streets," and the one in question as an "avenue," the map leaves the width of the avenue in doubt.

The contention of the city is that the filing of this map and the sale of lots referring to it, by the owners of the subdivision, under whom the plaintiff derives its title, operated as an offer to dedicate to public use, as a street and park, or pleasure ground, the whole of the space between the front tier of blocks and the line of ordinary high tide. In March, 1886, before the incorporation of Long Beach, the board of supervisors of the county passed a resolution that the "streets and alleys" in Long Beach shown on this map, "are hereby declared public highways." It is claimed that by this offer and acceptance the space above described became dedicated to the aforesaid public use. The city of

Long Beach was incorporated in February, 1888. Soon afterward the same claim was made by the city against the Long Beach Land and Water Company, the predecessor in interest of the plaintiff, and who then held the record title to the space in question. The company claimed that the dedication included only a strip one hundred feet wide adjoining the lines of said tier of blocks.

Said company, in February, 1889, began an action in the superior court of Los Angeles County against the city of Long Beach to quiet its title, alleged to be in fee simple, to all of the space between said tier of blocks and the ocean, except the strip one hundred feet wide which it designated as Ocean Park Avenue. After this action was begun the dispute was settled by agreement between said company and the city, whereby the city was to abandon the claim that the entire space, or any more than the northerly one hundred feet of it, was dedicated to public use, and the company was to convey to the city certain strips of land between the one hundred foot street and the bluff, to be used as a public park or pleasure grounds, and not to be obstructed by structures which would cut off the view of the ocean from the front lots in said tier of blocks. This agreement was not in writing, and it was not directly proven but it is fairly inferable from the evidence. In pursuance of this settlement, the city, by its attorneys, appeared in the action and filed an answer disclaiming any interest in the land claimed in the complaint, and stipulating that judgment might be given for the plaintiff. Judgment was thereupon entered on May 13, 1889, declaring that the said company was the owner in fee of all of the space between said one hundred foot street and the ocean and quieting its title thereto against all claims of the city for public purposes or otherwise. On the same day the said company executed to the city a deed purporting to convey to it, upon the conditions above stated, the strips of land above mentioned lying between the street and the bluff. Thereafter the company continued to assert title to the land, except that conveyed by it to the city, and conveyed parcels of it to divers persons who have used the same for private purposes exclusively. The plaintiff has succeeded to one of these parcels, being the land here in controversy.

The judgment is a determination, conclusive upon the city and the public, that the land in question is free from public use and that it then belonged to the Long Beach Land and Water Company, to whose title plaintiff has succeeded. A judgment by a court having jurisdiction of the city as one of the parties operates to divest the public use and establish title in fee in the plaintiff, as fully as if the city held the land in its proprietary capacity, or as if it were a natural person, and even if the judgment is erroneous in point of law, upon the facts shown. It bars both the city and the state. (*People* v. *Holladay*, 93 Cal. 241, 251, [27 Am. St. Rep. 186, 29 Pac. 54] ; *San Francisco* v. *Holladay*, 76 Cal. 18, 22, [17 Pac. 942] ; *People* v. *Smith*, 93 Cal. 490, [29 Pac. 57, 247].)

The attack on the judgment was on the ground that it was obtained by fraud, and was given on the consent of attorneys who had no authority from the city. There was no evidence of fraud, nor of the want of authority of the attorney. In the absence of such evidence the authority of the attorney is presumed. The objections on these grounds are completely answered by the decision in *Carpentier* v. *Oakland*, 30 Cal. 439, 446. (See, also, *Deegan* v. *Deegan*, 22 Nev. 185, 197, [58 Am. St. Rep. 742, 37 Pac. 360] ; *Wandling* v. *Straw*, 25 W. Va. 692, 703; 1 Freeman on Judgments, sec. 128; Code Civ. Proc., sec. 283.)

2. The court found that the land claimed by the plaintiff consists of accretions along the seashore made since the year 1882. The evidence indicates that the land lies south of the high-tide line as it existed in 1867 when the Cerritos Rancho was patented. By the act of May 1, 1911 (Stats. 1911, p. 1304), the state granted to the city of Long Beach "all the tide-lands and submerged lands, whether filled or unfilled, within the present boundaries of said city, and situated below the line of mean high tide of the Pacific Ocean," in trust for purposes of navigation. The city claims title under this grant. Counsel assert the doctrine that the patent for the Cerritos Rancho, although it established the line of mean high tide as the southern boundary thereof, granted only the lands lying north of said tide line as it was then situated, that all lands then lying below mean high-tide line were the property of the state, that accretions subsequently formed, or, in any event, all that have been formed along the ocean front

since the adoption of section 1014 of the Civil Code in 1872, remain the property of the state, and did not become the property of the owner of the adjacent upland, and that the grant from the state to the city in 1911, included not only the land lying below said tide line at that time, but also all of the land that lay below said line in 1872, and since then converted into upland by accretions or alluvion.

It must be admitted that the language of the granting act does not have that effect. It purports to be a present grant and to refer to conditions existing in 1911, and it is limited to lands "situated below the line of mean high tide of the Pacific Ocean." This means the line as it was situated at that time. The land claimed by plaintiff was then situated above the mean high-tide line and it was, therefore, not included in the grant to the city from the state. If the city has no title, the judgment that the plaintiff is the owner of the land in fee is not prejudicial to the city. The state alone could complain, if it has any right or interest under the doctrine above referred to, and it is not a party to the action. This action was begun on May 23, 1911, three weeks after the passage of the act granting the tide-lands to the city. The evidence shows that no accretions were made in the interval.

There was evidence showing that after the action was begun, and before the trial was ended, accretions were made adding several feet to the land above mean tide line. The judgment was entered on January 6, 1913. It declares the line of mean high tide to be the south boundary of the land adjudged to plaintiff. It, therefore, becomes necessary to determine whether accretions formed since the passage of the act of May 1, 1911, belong to the plaintiff or to the city.

The claim of the city to such accretions is based entirely on the proposition that the law of this state is that land formed by alluvion along the shore of the sea does not belong to the owner of the adjoining upland, but remains the property of the state in virtue of its sovereignty, as it was while the tides flowed over the space covered by the alluvion. The proposition, considered in the light of its practical application and consequences, is certainly a most extraordinary one. California has more than one thousand miles of seashore to which land is continually being added by alluvion, and from which land is continually being taken away by reliction. The

actual line of mean high tide, as it existed when the state was formed, or as it was in 1872, when the Civil Code was enacted, has never been surveyed, and in places where relictions or alluvions have changed the shore line, the original line is unknown and cannot be ascertained with any degree of certainty. If the doctrine is correct, the state is the real owner of innumerable parcels of land added to the shore by alluvion which hitherto have been supposed to belong to the respective owners of the upland to which they have been added and the boundaries of which cannot now be ascertained. It is not difficult to see that great uncertainty, confusion, and much litigation would ensue if such doctrine were established and enforced.

The proposition is contrary to the great weight of authority. The act of April 13, 1850, declared that the common law of England shall be the rule of decision in this state, where it is not repugnant to the federal or state constitution or to the statutes of the state. (Stats. 1850, c. 95, p. 219.) This provision is now a part of our Political Code. (Sec. 4468.) The law of alluvion is thus stated by Blackstone: ''And as to lands gained from the sea, either by alluvion, by the washing up of sand and earth, so as in time to make *terra firma,* or by dereliction, as when the sea shrinks below the usual water marks; in these cases the law is held to be that if the gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For *de minimus non curat lex;* and besides, these owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is, therefore, a reciprocal consideration for such possible charge or loss.'' (2 Blackstone's Commentaries, 262.) This is practically the universal rule. (3 Washburn on Real Property, 6th ed., sec. 1884, p. 74; 1 Am. & Eng. Ency. of Law, 468; *Camden etc. Land Co.* v. *Lippincott,* 45 N. J. L. 405, 410; *Mulry* v. *Norton,* 100 N. Y. 424, 434, [53 Am. Rep. 206, 3 N. E. 581]; *Shively* v. *Bowlby,* 152 U. S. 1, 35, [38 L. Ed. 331, 344, 14 Sup. Ct. Rep. 548]; *St. Clair County* v. *Lovingston,* 90 U. S. (23 Wall.) 46, 57, [23 L. Ed. 59]; *Hagan* v. *Campbell,* 33 Am. Dec. 277, note.) There is a statement of Chancellor Kent that land gained by accretion belongs, ''in the case of the sea or navigable rivers, to the sovereign.'' (3 Kent's Commentaries, 428.) This is part of a passage defining the law of accretion. It is directly

contrary to the cases cited by the author to support it. In a footnote to the fourteenth edition, Mr. Gould, the annotator, cites *Zeller* v. *Southern Yacht Club,* 34 La. Ann. 837, as sustaining the doctrine. The opinion in that case is not clear on the question whether the land in controversy was upland made by accretion, or was land under the waters of Lake Pontchartrain. So far as it refers to the right to accretions, it appears to be based on the authority of article 510 of the Louisiana Civil Code, which it gives as declaring that the right of the upland owner to land left dry by derelictions "does not take place in case of derelictions of the sea." That state has not, so far as we are aware, adopted the common law. The case is, therefore, not in point here. It is contrary to all common-law authority.

The city relies on the application of the maxim, *expressio unius exclusio est alterius,* to section 1014 of the Civil Code. This section is as follows: "Where, from natural causes, land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."

The argument is that since this section mentions the banks of a "river or stream," and does not mention the seashore, it must be taken as abrogating the common law, so far as alluvion upon the seashore is concerned. This theory would make an omission to say anything on a subject operate as an affirmative declaration repealing an existing law on the subject not mentioned. We do not think the rule of construction relied on should be carried so far in this case, if, indeed, it could be done in any case. The doctrine that the right to alluvion exists in the owner of the seashore, as well as elsewhere, has been recognized in our decisions. (*Dana* v. *Jackson St. W. Co.,* 31 Cal. 118, 120, [89 Am. Dec. 164] ; *Wright* v. *Seymour,* 69 Cal. 122, 126, [10 Pac. 323].) The United States circuit court of appeals seems to have reached the conclusion that section 1014 covered the entire law of the state on the subject of alluvion, that it was exclusive in its character, and that it abrogated the common law of alluvion as applied to the seashore, in its decision in *Western Pac. Ry. Co.* v. *Southern Pac. Co.,* 151 Fed. 376, 397, [80 C. C. A. 606]. This conclusion was founded upon section 4 of the Civil Code, declaring that

"The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed with a view to effect its objects and to promote justice." Doubtless section 1014 establishes the law of this state on the subject of alluvion deposited in rivers and streams. But that section does not purport to establish the law with regard to alluvion on the seashore, nor to declare that neither alluvion, nor the rights growing out of it by the common law, shall exist on land abutting upon the ocean. There is nothing in section 4, nor in the maxim above mentioned, that requires that section 1014 should be given that effect. We do not approve the construction given to it in the above-cited case.

Our conclusion is that the right of the upland owner to additions to his land by alluvion or accretions exists where the land abuts upon the ocean, and that section 1014 of the Civil Code has no application to alter the common-law rule in that respect.

There are no other points that require notice or affect the merits of the case.

The order is affirmed.

Sloss, J., Melvin, J., Lorigan, J., Lawlor, J., and Angellotti, C. J., concurred.