[Civ. No. 1699.   First Appellate District.—August 23, 1917.]

## CITY OF OAKLAND (a Municipal Corporation), Respondent, v. PETER L. WHEELER et al., Appellants.

EMINENT DOMAIN—CONDEMNATION OF LANDS ON OAKLAND WATERFRONT —COMPLAINT—SUFFICIENCY OF DESCRIPTION—SHIP CHANNEL.—In an action by the city of Oakland to condemn for public purposes certain lands on its waterfront, the description of the southerly boundary thereof as the northerly boundary line of the ship channel in Oakland harbor which was the line of ordinary low tide of May 4, 1852, and which northerly boundary line of ship channel was the southerly boundary line of the lands granted and released to the town of Oakland by the act of the legislature approved May 4, 1852, is sufficiently definite and certain, as the words "ship channel" as employed in the complaint and the statute meant the line of low tide of the date of the statute.

ID.—LOCATION OF BOUNDARY LINE—EVIDENCE.—Where in such an action the parties are unable to agree as to the location of the southerly boundary line of the lands sought to be condemned, and it is impossible to determine its exact location by reason of the accumulation of debris thereon, it is permissible to introduce evidence of such location, in view of the sufficiency of the description, set forth in the complaint.

ID.—COAST SURVEY CHART OF UNITED STATES ENGINEERS—ADMISSIBILITY. A coast survey chart of United States engineers of the coast and geodetic survey is competent evidence under sections 1920 and 1926 of the Code of Civil Procedure to establish the boundary line, as such map is an original record of the United States.

ID.—ACCURACY OF MAP—OPINIONS OF EXPERTS INADMISSIBLE.—Opinions of engineers as to the accuracy of a geodetic map introduced in evidence are inadmissible, as the matter is a question for the jury.

ID.—FIXING OF DAMAGES—VALUE AT ISSUANCE OF SUMMONS—CONSTITUTIONAL PROVISION.—The provision of section 1249 of the Code of Civil Procedure that the value of condemned property shall be fixed as of the date of the issuance of the summons, is constitutional.

ID.—RIPARIAN OWNERS UPON NAVIGABLE WATERS—ACCESS TO DEEP WATER.—Owners of land upon the littoral of a navigable bay have no right of access to deep water over intervening tide-lands.

ID.—WHARFING-OUT PRIVILEGE TO DEEP WATER—ADVERSE POSSESSION.— The exercise by the owners of waterfront property of a wharfing-out privilege to deep water for thirty-seven years (1852 to 1889) did not give them title by adverse possession thereto, in view of the with-

drawal from sale of the lands below low tide by the Constitution of 1879.

ID.—ACCRETION—INSTRUCTION.—An instruction on the subject of accretion was properly refused, in view of the fact that no attempt was made to condemn any land added by accretion, though there was testimony that the tide line had been extended from the shore by accretion.

ID.—TRIAL OF ACTION—THEORY—APPEAL.—Where such action was tried on the theory that all questions at issue could be properly submitted to the jury, and the trial court was never in plain language asked to take the issues as to boundaries from the jury, and the defendant's introduced evidence upon the subject, they cannot contend on appeal for the first time that no question but the amount of the compensation to be paid for the property should have been submitted to the jury.

APPEAL from a judgment of the Superior Court of Alameda County, and from an order of condemnation and order authorizing the taking of possession of condemned property. John Ellsworth, Judge.

The facts are stated in the opinion of the court.

Chapman & Trefethen, Wm. B. Bosley, Goodfellow, Eells, Moore & Orrick, for Appellants.

Paul C. Morf, City Attorney, and Charles A. Beardsley, for Respondent.

BEASLY, J., *pro tem.*—The appeals in this case are taken by defendants, trustees of the Samuel Merritt Hospital, from a judgment of the superior court of Alameda County, condemning for public purposes certain lands owned and held by said trustees on the Oakland waterfront of San Francisco Bay, from a final order of condemnation of these lands, and from an order authorizing plaintiff to take possession thereof.

The facts in this case naturally group themselves about the questions of law which are presented on this appeal, and they will therefore be stated so far as they are material in connection with the discussion of these questions.

1. The first contention of the appellants is that the property sought to be condemned was not described by plaintiff in the pleadings with definiteness nor so that it could be located with certainty. This question was presented in vary-

ing forms to the trial court, for example, by a demurrer to
plaintiff's amended complaint, by objection to the introduc-
tion of evidence of the disputed boundary, and by instruc-
tions which the court was requested to give the jury "that
if the location of the southern boundary of the property could
be ascertained only by taking the testimony of witnesses they
should render a verdict in favor of the defendants"; and by
a motion that the court require the location of the disputed
southern boundary of the property to be fixed.   On all these
points the trial court ruled against the defendants.

The southern boundary of the property sought to be con-
demned is alone in dispute.   The description of this line as
found in the amended complaint on which the judgment rests,
with so much of the remainder of the boundaries of the prop-
erty as is necessary to understand the objections urged by
defendants, is as follows: " . . . thence southerly along said
center line of Washington street extended southerly on its
present course to *the northerly boundary line of ship channel
in Oakland Harbor, which northerly boundary line of ship
channel is the line of ordinary low tide of May 4th, 1852,
and which northerly boundary line of ship channel is the
southerly boundary line of the lands granted and released to
the town of Oakland by an Act of the legislature of the State
of California entitled 'An act to incorporate the town of Oak-
land and to provide for the construction of wharves thereat,'
approved May 4th, 1852;* thence westerly along *the said north-
erly boundary line of ship channel* to the center line of Clay
street . . . "

The italicized portions of the description indicate the dis-
puted southerly boundary line.   The three criticisms of the
description of this line in the complaint, as stated by de-
fendants are (a) that the description of this boundary line
is on its face uncertain; (b) that the southerly boundary can-
not therefrom be located on the ground at all, and (c) that
if it can be so located the location can only be made by the aid
of evidence outside the description in the complaint and in
addition thereto.

These questions are stated and presented at great length
and, as has been said, in varying form; but this statement
sets them forth so that they can be clearly understood, and
whether presented by special demurrer or in the form of the
various motions, objections to evidence, and requests made

to the court at various stages of the trial, present identical questions so far as this phase of the case is concerned.

This description is sufficient under a decision of the supreme court passing upon this same question arising out of this very description. A brief history of the defendants' title will assist in understanding that this is a correct conclusion. The town of Oakland was incorporated under an act of the legislature in effect May 4, 1852, which is the act referred to in the description above quoted, and which is entitled as therein set forth (Stats. 1852, p. 180). By this act all the land within the limits of the town between high tide and "ship channel" was granted to the town, with the right in the town to wharf out upon the entire waterfront from said lands. Within one month of the taking effect of this act the town of Oakland conveyed all the land so granted to it to one Horace W. Carpentier, and also in the same instrument granted to him a wharfing-out privilege on the entire waterfront of the town for a period of thirty-seven years; and in 1868 Carpentier in turn conveyed all this property and the accompanying wharfing-out privilege to the Oakland Water Front Company.

In this same year, 1868, Samuel Merritt, then mayor of the city of Oakland—which had meanwhile become the municipal successor of the town of Oakland by legislative act in 1854 (Stats. 1854, p. 183), made an arrangement with the Oakland Water Front Company pursuant to which he established a lumber-yard on this property, and built a wharf out to deep water thereon. Of course he acquired by this arrangement no rights beyond those which had already been granted to Carpentier and conveyed by him to the Oakland Water Front Company. From Merritt this property came in time into the hands of these defendants. The exact description of the waterside boundary of the Oakland waterfront so far as here involved contained in the act of 1852, under which the town of Oakland was incorporated and acquired these lands is as follows: "The lands lying within the limits aforesaid (i. e., the corporate limits of the town as defined in the first section of the act) between high tide and ship channel." It will be seen that the term "ship channel" employed in this act is the exact term used in plaintiff's amended complaint to describe the southerly boundary of the property sought to

be condemned in this proceeding. It is about the meaning of the words "ship channel" that this controversy is waged.

This description is both precise and definite, for it is held in *Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160, [50 Pac. 277], that the words "ship channel" as employed in this statute mean the line of low tide of the date of the statute, namely May 4, 1852, and in that case (118 Cal. 177, [50 Pac. 283]) in the court's opinion, the supreme court of this state, in determining the meaning to be given to the words "ship channel" in this very act of 1852, says: "The next term of the description which requires construction is 'thence to ship channel.' What did the legislature mean by 'ship channel?' . . . It is certain some meaning must be ascribed to the term 'ship channel' in order to give effect to the act, and it must be some precise and definite meaning, for the law abhors want of definition in matters of boundary as nature abhors a vacuum. Especially is this true with respect to the boundaries of a municipal corporation invested with power and authority to make and enforce local laws, civil and criminal. It is not to be supposed that the legislature, in conferring the municipal franchise upon the inhabitants of a local district, will purposely leave its boundaries in any respect uncertain. On the contrary, it must be assumed that the intention was to mark the boundary so exactly and definitely that no question could arise as to whether a particular spot was within or without the local jurisdiction. . . . And when we are required to locate its boundaries with precision, and no artificial boundary has been established by competent authority, we are driven to seek a definite natural boundary, if any such may be found; and here we do find such a boundary at the line of low tide. This is a definite line, and the only definite line beyond the line of high tide, and my conclusion is," said the learned Chief Justice Beatty in his opinion in the case, "that the line of low tide as it existed on the 4th of May, 1852, was the western boundary of the town of Oakland intended by the original act of incorporation." In summing up the result of his discussion on this topic the late Chief Justice says: "The boundary of the town of Oakland as defined by the act of May 4, 1852, commencing at the intersection of the northeast line with the line of low tide on the eastern side of the northern branch of the estuary, follows the line of low tide on said branch to the

mouth of the eastern basin, crosses said mouth and continues along the line of low tide on the southern side of the estuary to its mouth in the bay, and thence follows the line of low tide northerly and easterly till it intersects the northeast boundary line, as to the location of which there seems to be no dispute."

The quoted language used by the court was employed in considering the exact line in dispute in this case; and the language of the court leaves nothing to be decided when it is applied to the case now under discussion. Indeed, the description above quoted from the complaint herein is the description contained in the act of 1852, *supra,* construed with and supplemented by the definition of the words "ship channel" as given in the Oakland Water Front case, where the words "ship channel" are held to have a precise and definite meaning. Under this authority it must be held that the description used in the amended complaint in this case is definite and certain. As a matter of law, it is as definite and certain as if it were a line of rock or the thread of a stream or any other natural boundary.

2. Counsel for defendants also claim that it was error for the trial court to permit evidence to be introduced at the trial as to the location of this southerly boundary upon the ground, because of what they claim is the uncertainty of this description. The low-tide line had been covered by debris placed over it by the defendants' predecessors in ownership; and it seems to be claimed now that the line of low tide had receded during the intervening years between 1852 and the beginning of this action. The contentions of counsel on these points can be stated largely in their own language thus: "In order to locate the line in question the position of the line of low water on the north side of the estuary as it existed on May 4, 1852, must first be determined," and it is contended that the rule of law governing descriptions in condemnation proceedings under the power of eminent domain is this: that "the property or interest to be acquired must be ascertainable from the description thereof in the petition itself without reference to extraneous facts." If by this is meant that the description must be a boundary the location of which can be found by any person looking for the location of the line unaided by anything but the data contained in the description itself, the proposition is too broadly stated; for a section line running

over a brushy hillside would hardly be challenged, nor would it be seriously argued that it is not a sufficient description in a condemnation proceeding, although it might require the services of a land surveyor to ascertain its actual location, and the line of a stone wall covered by the debris of years would be a sufficient description even though excavations were necessary to uncover it and show it to the officer executing the judgment of condemnation. (*Thompson* v. *Trowe,* 82 Minn. 471, [85 N. W. 169].) And the fact that the parties are not able to agree as to where the lines of location run upon the ground, or as to what property is included within them, does not make a description insufficient in condemnation proceedings under the power of eminent domain. (*Coe* v. *Aiken,* 61 Fed. 24.) Counsel cite many cases as sustaining their position on this point; but the distinction drawn in at least one of these cases, and which seems applicable here, is, in the language of the court in the case of *Coe* v. *Aiken, supra,* that "if the description is uncertain in law—not merely in fact but in law—it cannot stand; but that it is uncertain in fact, that individuals may differ in regard to its construction and it must go to the courts to ultimately settle its boundaries, do not make it uncertain in law, as the law says that what can be made certain is certain." This is only another manner of saying that such a description may be sufficient in a pleading, although its exact location on the ground might require some search or investigation outside the data contained in the description itself. This description being certain in law, as was held in the Oakland Water Front case, *supra,* its exact location under the debris with which it was covered could be and was shown by the introduction of evidence at the trial. In fact there is no way by which such a line can be made certain and its definite location made binding upon the defendants if they choose to dispute the fact, except by settling the question in a proceeding or trial where there are adversary claims as to the line to be settled between the parties; and the law provides no means for obtaining a judgment adjusting or fixing boundaries between parties in contemplation of condemnation proceedings. The defendants for another reason should not be allowed to complain of this, for they were at all times in possession of the land and in a position to ascertain the line by uncovering it, and by the other means which, as appeared at the trial, were adopted

by the witnesses for ascertaining its location. The plaintiff was not in as good a position as the defendants, if in a position at all, to do this before the complaint was filed. The debris which covered the line and hid it was placed upon it by the defendants' predecessors in interest, who filled in the land over it without regard to whether or not they obliterated or obscured their boundaries. Besides this, in their amended and supplemental answer upon which the action first went to trial and under which the trial continued for eight days, the defendants averred that their southern boundary (the one in dispute) was the present low-tide line, that the land sought to be condemned "is the very parcel described by the plaintiff and bounded on the south by the low-tide line of 1852," and that this "present low-tide line" is "identical with the ordinary low-tide line on the northerly shore of the estuary of San Antonio or Oakland harbor in front of said parcel of land on the fourth day of May, 1852"; and they do not deny the allegations of plaintiff's amended complaint filed during the trial that the property described therein was the whole of the parcel of land owned by them. Further, the manner in which the trial proceeded precludes defendants from now objecting to the evidence locating this line upon the ground, which was introduced in behalf of the plaintiff, for at the opening of the trial the plaintiff introduced in evidence a, *lis pendens* properly recorded, the charter of the city of Oakland approved by the legislature in the year 1889, and the so-called new charter of the city of Oakland approved by the legislature in the year 1911, an ordinance determining that the public interest and necessity demanded the construction of certain permanent public municipal improvements for which the condemnation of this land was necessary, a resolution of the city council authorizing the city attorney to commence this action as required by the charter, and thereupon the plaintiff rested its case without offering any evidence as to the location of this boundary. The defendants then took the oar, and called witness after witness to prove the location of this southern boundary line of their property upon the ground. They accepted the case made by the plaintiff, and themselves assumed the burden of introducing evidence to show the location of their boundary. In the face of all this it must be held that plaintiff's evidence as to the

34 Cal. App.—29

location of the southerly boundary of the defendants' property on the ground was properly admitted by the trial court.

It is true that some of the witnesses called, as above stated, on behalf of the defendants, to testify as to the location of this boundary said that by the description in the complaint they could not locate it; one of them said he would have to hunt up evidence outside the courtroom to enable him to locate it; and the defendants then and not before moved the court to require plaintiff to specify—presumably by measurements in feet and inches, although they did not say so—the tract sought to be condemned, to the end, as they claimed, that they might be enabled to know what questions to ask witnesses as to value. This motion was denied in terms by the court, but in effect it was complied with by the attorneys for the city, for during weeks of the trial thereafter they produced evidence as to the location of this line. Under these circumstances and facts it cannot be held, as is the contention of the defendants, that the boundary cannot be located on the ground, nor that evidence tending to locate it was improperly admitted, for they themselves invited and precipitated this method of proceeding under which the court permitted evidence to be introduced upon this subject.

The defendants now claim, however, that their evidence on the subject of location of the southerly line was not offered to establish the boundary, but to show that it could not be located. Before insisting upon this construction of their case, however, the defendants offered evidence of the length of their boundary lines, of the location of a certain stone wall on their property, of the area of their wharf, of the location of the present low-tide line alleged by them to be the same as the line of May 4, 1852, and other evidence of the same purport. It is impossible to read this evidence without coming to the conclusion that it was introduced in an attempt to locate this boundary. The trial court certainly so understood it, as is evident from the context; and this being so, the competent evidence on the same point subsequently offered by plaintiff was properly admitted.

To sum up this phase of the case, we must hold that the description of this boundary line is not uncertain; that while the boundary line could not be located upon the ground by simple inspection without the aid of evidence outside of and in addition to the description in the complaint itself, it could

be and was so located by the aid of competent evidence outside the description contained in the complaint and in addition thereto. All rulings adverse to defendants involving these contentions as to boundary were therefore correct.

3. This disposes of the questions arising directly from the claim that the description of the southerly boundary of the property sought to be condemned is uncertain, except that in dealing with the sufficiency of the description the exceptions to instructions given and refused on this subject seem to merit special mention in addition to what has already been said on that topic.

4. Complaint is made of an instruction in which the jury were told that the description was not uncertain in law. As may be gathered from what has been said, this was a correct statement of the law. The court left the question whether under the evidence the boundary could be located as a matter of fact to the jury, and by its instructions left to the jury the question of the location of the boundary on the ground and of the area of the land embraced within the parcel sought to be taken in the proceeding. From what has been said it will be seen that this instruction to the jury was not in conflict with the instruction that the description was not as a matter of law insufficient or uncertain.

5. The evidence introduced by the plaintiff to establish the location of the southerly or waterside boundary included the coast survey chart of 1855, made by the engineers of the United States coast and geodetic survey. The introduction of this map was objected to for many reasons, only two of which are sufficiently serious to require attention here. These are, first, inaccuracy, and, second, that it is not an official record such as is evidence under sections 1920 and 1926 of the Code of Civil Procedure—it being claimed that the map was made solely for the purpose of aiding navigation, and hence cannot be used to establish a boundary. The most that can be said in support of the first objection is that the evidence as to the accuracy of the map was conflicting. The evidence of the inaccuracy was introduced subsequent to the admission of the map in evidence. Besides, this map is an original record of the United States coast and geodetic survey, and as such is admissible in evidence under sections 1920 and 1926 of the Code of Civil Procedure (*Merryman* v. *Kirby,* 13 Cal. App. 344, [109 Pac. 635].) With this ruling admit-

ting the map under these conditions we cannot interfere. On the second point the witness Von Geldern testified that it was an original map and record of the United States coast and geodetic survey, and it appeared upon its face to be such a record. Under sections 1920 and 1926 of the Code of Civil Procedure it is provided that such records are *prima facie* evidence of the facts stated therein. This map is a record of the United States coast and geodetic survey, made in the performance of their duties by federal officers, as appears from the record. Nor does this map appear to have been made solely for purposes of navigation. It was properly admitted in evidence. The same rule applies for similar reasons to the coast and geodetic survey map of 1859. The court instructed the jury that these maps were *prima facie* evidence of the location of the lines shown thereon. To this instruction defendants objected. The disputed boundary appears on these maps. The instruction was therefore a correct statement of the rule of law embodied in sections 1920 and 1926 of the Code of Civil Procedure above quoted. (See 5 Cyc. 950, 955; *Breen* v. *Donnelly,* 74 Cal. 301, [15 Pac. 845]; *Goodwin* v. *McCabe,* 75 Cal. 584, [17 Pac. 705].) Whatever the rule may be elsewhere than in California, in this state these sections of the code cited settle the competency of these maps and their character as *prima facie* evidence of the facts sought to be established by them.

6. Defendants asked certain questions of the engineers who were witnesses on their behalf, which called for the opinions of these gentlemen concerning the accuracy and reliability of the coast and geodetic survey maps heretofore referred to, for the purpose of defining boundaries in private ownership which by deed or statute is defined to be the low-tide line. Objections to these questions were sustained, and properly so. These questions called for opinions of the witnesses as to the weight to be given by the jury to these maps as evidence. If any inaccuracies existed in the maps themselves these experts, if qualified to do so, could have been permitted to point them out; and they were permitted to do exactly this; but they could not be permitted to give their general opinions as to the value of these maps for the purpose of defining boundaries, nor as to the weight to be given them as evidence. These were questions for the jury, whose province it was to determine the weight and value of the maps as evidence.

These same experts were permitted to spend much time pointing out the incompleteness of these maps, and this is as far as they should have been permitted to go.

This answers also the exception to the court's ruling in excluding certain questions of similar import asked of the witness Davidson at the taking of his deposition.

7. The trial court properly instructed the jury that the value of the property should be fixed as of the date of the issuance of the summons, as is provided in the Code of Civil Procedure, section 1249. The question of the constitutionality of this section of the code raised by defendants is no longer an open one in this state. (*Los Angeles* v. *Gager,* 10 Cal. App. 378, [102 Pac. 17] ; *California S. Ry. Co.* v. *Kimball,* 61 Cal. 90; *San Jose etc. Co.* v. *Mayne,* 83 Cal. 566, [23 Pac. 522] ; *Tehama Co.* v. *Bryan,* 68 Cal. 57, [8 Pac. 673] ; *Sacramento Co.* v. *McDougall,* 19 Cal. App. 562, [126 Pac. 503].) The section is constitutional.

8. Complaint is made because the trial court refused to give certain instructions to the effect that defendants had a wharfing-out right on their property to deep water, and that this right must be considered by the jury in fixing their damages. Defendants requested several instructions along this line. The court gave one of these instructions, namely, that if the defendants had such right it should be considered in fixing their compensation for lands taken. It refused to instruct as a matter of law that the defendants had such wharfing-out right. It might have instructed that they had at the time of the issuance of the summons no such right, for it has been settled in *Dalton* v. *Oakland,* 168 Cal. 463, [143 Pac. 721], that owners of land upon the littoral of a navigable bay have no right of access to deep water over intervening tidelands. (*Western Pacific* v. *Southern Pacific Co.,* 151 Fed. 376, [80 C. C. A. 606.].) The instruction given was therefore more favorable to the defendants than it should have been, and they cannot complain of it.

9. But the defendants also claim a wharfing-out right acquired by adverse possession, and this claim will be considered. Appellants and their predecessors in ownership of this property exercised for thirty-seven years, from some time in June, 1852, until a corresponding date in 1889, the wharfing-out privilege granted by the town of Oakland to Carpentier in his deed of the former date. The exercise of

the right conferred by this instrument, whether it be termed a lease or by whatever designation it be characterized, estopped the defendants and their predecessors so exercising it from claiming title to or right or easement in the land below low tide on which the wharf stood as against the city of Oakland from whom they derived the right so exercised during those years. Assuming that it was possible for the defendants to have acquired title to this land below low tide, or any privilege to use it for wharfing-out, by adverse possession under any circumstances—which we do not concede to have been possible in this instance—still they did not so acquire either title or wharfing-out privilege, because before the termination of their privilege or lease under the Carpentier deed this land was withrdawn from sale by the Constitution of 1879 (Const. 1879, art. XV, sec. 3), and it has been held that the title to tide-lands withheld from sale cannot be acquired by adverse possession. (*Patton* v. *City of Los Angeles,* 169 Cal. 521, [147 Pac. 141] ; *People* v. *Southern Pacific Co.,* 169 Cal. 537, [147 Pac. 274].) So that having no deed to this property, and having acquired no title thereto or privilege of using this land, or user thereof, below the low-tide line by adverse possession, the defendants show no wharfing-out rights belonging to them at the time this summons was issued upon which they could stand in a claim for damages to or compensation for the taking of land below the low-tide line, for the defendants had no right of access to navigable water from their property.

10. The exception to the refusal of the trial court to instruct the jury upon the subject of accretion is not tenable, even if it be conceded, in view of what has already been said, that the defendants could have acquired additional land below the low-tide line of May 4, 1852, by reason of accretions thereto ; still under the pleadings in this case there was no attempt to condemn any land added to defendants' land by accretion, nor any land whatever below said low-tide line. It is straining and misconstruing both the evidence on the subject of accretion and the claims of plaintiff's brief to attribute to it an attempt to condemn any land added by accretion. The defendants contended that the evidence of the witness Hewer was introduced for the purpose of supporting a claim by the plaintiff to the right to take land so added to their holdings by accretion ; but the evidence of this witness

was material upon the question of the location on the ground of the tide line of 1852, and it is not necessary to refer its introduction to an issue as to accretion at all. Hewer testified—and to this testimony the objection is directed—that soil held in solution in water such as the Oakland estuary would be deposited by the water if the current were retarded by improvements such as wharfs built on piles—a fact which must be obvious to any person of intelligence who has had opportunities to observe flowing water carrying debris in solution. This case, therefore, should not be reversed on account of this evidence, even if it found no support in any other issue than that of accretion. The line to which the plaintiff desired to condemn was the definite low-tide line of May 4, 1852, and the city sought nothing beyond this, and could take nothing beyond this, under its pleadings. Hence if any land had been added by accretion below this line, and if the defendants had any claim to it, a separate proceeding would be necessary to acquire it; and it was stated in the briefs and at the oral argument, and not denied, that such separate proceeding has been instituted by the city and prosecuted to judgment.

11. No just complaint can be made by defendants of the failure of the court to instruct the jury on the subject of damages by severance, because no such instruction was requested. Trial courts cannot be expected to guard the rights of parties where they are represented by able and distinguished counsel, as was the case here.

12. Finally, the most serious contention urged by defendants is this: That no question except that of the amount of the compensation to be paid for the property should have been submitted to the jury, and that the question of boundary and location thereof on the ground, and the area of the land sought to be taken, should have been decided by the court. The court left all these questions to the jury. On the request of the defendants the court instructed the jury that if they should find that the disputed southern boundary was unascertainable their verdict must be for the defendants. During the entire trial, after the first eight days thereof, the defendants contended that under the pleadings the court had no authority to hear evidence upon the question of the location of the southern boundary of this land. They did indeed, after four days consumed in introducing evidence directed

to the location of their southerly boundary, make certain
requests of and directed certain motions on the subject to the
court. These requests and motions were "that the plaintiff
be required to amend its complaint and specifically describe
the property"; that the court "direct them as to the par-
ticular property which should be valued by them"; that
"plaintiff be required to first establish the line before de-
fendants were required to introduce any evidence of value";
that the "southern boundary be definitely established *either*
by a *verdict of the jury,* or by the *determination of the court."*
This last request is instructive of the attitude of court and
counsel in the trial of this case. The case was tried from
the beginning on the theory that all questions in issue could
be properly submitted to the jury. Let it be borne in mind
that this trial took place in the year 1911, which was three
years before the decisions of the supreme court which counsel
claim hold that the only question proper for the jury in
condemnation cases in eminent domain is that of the amount
of compensation to be paid for the property. (*Vallejo etc.
R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, [147 Pac. 238];
*City of Oakland* v. *Pacific Coast Lumber Co.,* 171 Cal. 392,
[153 Pac. 705]; *San Joaquin etc. Irr. Co.* v. *Stevenson,* 26
Cal. App. 274, [147 Pac. 254, 258].) These cases were all
decided in the year 1915. The trial court was never in this
case asked in plain language to take the issues as to the
boundaries from the jury. Before the time when the motions
above referred to were made the defendants had, as hereto-
fore stated, introduced much evidence upon the subject of
boundary and its location. Not having asked the court in
definite terms to take these issues from the jury, but know-
ing the theory upon which the court and counsel were pro-
ceeding, namely, that the solution of all issues was for the
jury, counsel for the defendants cannot now be heard to
complain of the method pursued by the trial court in the con-
duct of this case, for the theory of all the counsel in the case,
as plainly appears from the entire record, was that all issues
should be submitted to the jury, and that upon them they
might return a general verdict. Nor can counsel now com-
plain because the court, without plain and unequivocal notice
of their contention that these questions must be tried and
decided by the court, failed to make findings upon these issues,
but entered its judgment upon the verdict of the jury alone,

for no one of the counsel in this case during the trial extending over months of time ever asserted that these issues other than compensation and damages must be decided by the judge, nor that findings should be made in addition to the verdict upon these questions, and no one can read this record without being convinced that court and counsel for all parties assumed from beginning to end of the trial that all the issues should be submitted to the jury, that they could bring in a general verdict thereon, and that their verdict was final.

When a case has been tried upon a well-defined theory, accepted by all parties and the court as well, counsel cannot after years have elapsed raise for the first time in this court the question of the correctness of this theory. Many cases announce such to be the general rule of practice. In most of them it is true the party appealing complained of some finding outside the issues, or of the reception of some evidence on some question not raised by the pleadings. But there seems to be no reason why the same rule should not apply where all parties have assumed that issues were to be tried by the jury, or have assumed and tried the case upon the theory that the jury's verdict was absolute and final rather than advisory. (*Lestrade* v. *Barth,* 19 Cal. 660; *Moore* v. *Copp,* 119 Cal. 429, [51 Pac. 630].) And in any event it does not appear from the record that findings were not waived, and nonwaiver thereof will not be presumed. (*Cushing-Wetmore Co.* v. *Gray,* 152 Cal. 118, [125 Am. St. Rep. 47, 92 Pac. 70]; *Baker* v. *Baker,* 139 Cal. 626, [73 Pac. 469]; *Leadbetter* v. *Lake,* 118 Cal. 515, [50 Pac. 686]; *Tomlinson* v. *Ayres,* 117 Cal. 568, [49 Pac. 717]; *Richardson* v. *Eureka,* 110 Cal. 441, [42 Pac. 965]; *Kritzer* v. *Tracy,* 16 Cal. App. 287, [116 Pac. 700].)

The difference of view of counsel in this case was never as to whether court or jury should try the issues. It does not seem to have occurred to any of the eminent counsel in the case that all the issues should not be submitted to the jury. The difference between them was as to what the issues were— not as to who should try them. Counsel are bound by a theory in which they plainly acquiesced until the subsequent decision of cases in the supreme court of California, which the trial court did not at the time of the trial have as guides, indicated that this theory was incorrect. To reverse this case

now upon such a contention would be a great injustice to the plaintiff.

In addition to this it may be said that there was no seriously disputed issue of fact in this case requiring findings by the court. A recital of the issues made by the pleadings is instructive on this point. The plaintiff alleges that the defendants were trustees and owners of the property, and that the plaintiff was a municipal corporation empowered to condemn the property for certain specific public uses, that the object of this proceeding was to condemn the property for these uses, and further alleges the passage of a resolution determining the necessity for the acquisition of the property and the creation of a bonded indebtedness to bear the expenses of the condemnation, and that the same was not now devoted to public use but was held and used for private purposes. None of these allegations of the complaint was seriously disputed, nor was any of them denied by defendants' final answer to plaintiff's amended complaint, and even if issues such as these had been made by the pleadings there was no evidence whatever upon which the court could predicate a finding that would stand in this court contradicting any of these allegations. The defendants in their turn allege their right of access to navigable water from their property. As we have seen, they had no such right. There is no dispute of the allegations of the defendants as to their improvements or as to certain leases and possession by the lessees. There was therefore no disputed issue of the class which defendants contend the court must try, and hence no necessity for findings.

The judgment and orders appealed from are affirmed.

Richards, J., and Kerrigan, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on September 22, 1917, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 18, 1917.