[S. F. No. 7743. In Bank.—February 28, 1919.]

CITY OF OAKLAND (a Municipal Corporation), Respondent, v. SAMUEL H. BUTEAU et al., as Trustees, etc., Appellants.

[1] BOUNDARIES — LAND BORDERED BY RUNNING STREAM — SHIFTING BOUNDARY.—Where land is bordered by a running stream, a boundary marked by a water line is a shifting boundary, going landward with erosion and waterward with accretion, and express statutory declaration to this effect is found in section 1014 of the Civil Code. The rule is the same in this state as to lands bordering tidal waters.

[2] MUNICIPAL CORPORATIONS—CITY OF OAKLAND—LEGISLATIVE GRANT OF WATERFRONT LANDS—"SHIP CHANNEL" AS BOUNDARY—MEANING OF TERM.—Under the act of the legislature of May 4, 1852 (Stats. 1852, p. 180), incorporating the town of Oakland and granting to the town the waterfront lands lying within certain limits "between high tide and ship channel," the true interpretation of the term

"ship channel" is the line of low tide, as affected by such gradual and imperceptible changes as may from time to time take place in the location of that line.

[3] ID.—ACTION BY CITY FOR RECOVERY OF LAND BELOW SHIP CHANNEL—POSSESSION BY DEFENDANTS FOR WHARFING PURPOSES—LOCATION OF LOW TIDE LINE OF 1852—BURDEN OF PROOF.—In an action by the city of Oakland to recover the possession of certain waterfront land lying below the line of ship channel held by defendants and used by them for wharfing purposes, the city having by prior condemnation proceedings acquired the right of possession of the land above ship channel theretofore owned by the defendants in fee, the burden was upon the city to show where, with reference to the present low tide line, the line of 1852 lay, and that defendants were wrongfully in the possession of the land sought to be recovered.

[4] ID.—PLEADING—ANSWER—TRUE BOUNDARY LINE—ABSENCE OF ESTOPPEL.—In such action, the defendants were not precluded from contending that the boundary was not the tide line of May 4, 1852, by setting up in their answer that the true boundary was the line of extreme low tide, rather than ordinary low tide.

APPEAL from a judgment of the Superior Court of Alameda County. William H. Waste, Judge. Reversed.

The facts are stated in the opinion of the court.

Chapman & Trefethen, Goodfellow, Eells, Moore & Orrick, S. A. Bailey, William B. Bosley and Garret W. McEnerney for Appellants.

Paul C. Morf, H. L. Hagan, City Attorneys, and John J. Earle, Assistant City Attorney, for Respondent.

SLOSS, J.—The defendants appeal from a judgment awarding the possession of real property to the plaintiff.

This action and a prior one entitled *City of Oakland* v. *Wheeler et al.*, 34 Cal. App. 442, [168 Pac. 23], are companion cases. In each the city of Oakland, as plaintiff, proceeded against the same defendants as trustees of the Merritt Hospital. The suits affect adjacent parts of a tract of land on the waterfront of Oakland. The property involved in the two actions, viewed as a unit, consists of a parcel bounded on the north by First Street, on the east by Washington Street extended southerly, on the west by the center line of Clay

Street extended southerly, and on the south by the north pier-head line of Oakland harbor, as established by the United States government. Washington and Clay Streets are parallel, and First Street runs at right angles to them. The pier-head line has the same general direction as First Street, but is not exactly parallel thereto. At the intersection of the westerly line of Washington Street projected, the pierhead line is about 510 feet southerly from First Street. At its intersection with the center line of Clay Street projected it is some 560 feet distant from First Street. The distance between the westerly line of Washington Street and the center line of Clay Street is 340.25 feet. Part of the land involved is above the line of low tide and part of it below, the pierhead line established by the federal government lying some distance southerly from the low tide line.

Prior to the institution of either action the defendants were admittedly the owners of so much of the tract as lay above the line of low tide. They held as successors to the Oakland Water Front Company, which had acquired its title from Horace W. Carpentier, who, in turn, deraigned title from the city of Oakland. The history of the legislation, and the subsequent dealings of the city, affecting the waterfront lands is fully set forth in the decision of this court in *City of Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160, [50 Pac. 277], and we need not repeat it here. It will suffice to say that by an act of the legislature of May 4, 1852 (Stats. 1852, p. 180), incorporating the town of Oakland, the legislature granted to the town (the predecessor of the present city of Oakland) the lands lying within certain limits "between high tide and ship channel." The term "ship channel," used to mark one of the boundaries of the grant, has been the subject of much discussion in this court and elsewhere, and we shall have occasion to advert to it at a later stage of this opinion.

The earlier case to which we have referred (*City of Oakland* v. *Wheeler*) was a suit in eminent domain, by which the city of Oakland sought to condemn so much of the tract occupied by the defendants as lay above the line of "ship channel." The judgment of condemnation was made December 21, 1911, the damages to be paid defendants being assessed at $211,315.06. A final order of condemnation was made February 10, 1912, and an order letting the municipality into possession on March 9, 1912.

Appeals from the judgment of condemnation and the two orders were taken and were heard in the district court of appeal for the first appellate district, where the judgment and orders were affirmed on August 23, 1917. (*City of Oakland v. Wheeler*, 34 Cal. App. 442, [168 Pac. 23].) A petition for transfer of the case to this court was denied.

The present action was begun on February 23, 1912, after the judgment and the final order of condemnation, and shortly prior to the order letting the city into possession of the condemned area. It is brought to recover possession of the land lying below the line of ship channel. The theory upon which the city went in the litigation was that by the condemnation proceedings it had acquired the right of possession of the land above ship channel theretofore owned by the defendants in fee, and that in the present action it was entitled to recover possession of the land below ship channel, held by the defendants and used by them for wharfing purposes. The claim was, and is, that the defendants and their predecessors had originally gone into occupancy of the land here involved as tenants of the city of Oakland under a lease which had expired before this suit was commenced. The appellants strongly attack the soundness of this claim, but the conclusions we have reached on other points will dispose of the appeal without the necessity of passing on the question just suggested.

In the condemnation suit, as well as in the present action, the city took the position that the line marking the boundary of the property granted to the city of Oakland by the act of May 4, 1852, and, consequently, the southerly boundary of the land owned by the defendants as successors of Carpentier, to whom the city had conveyed, was the line of low tide, as that line existed on the fourth day of May, 1852, the date of the enactment of the granting statute. In the proceeding in eminent domain the property sought to be acquired was described as bounded on the south by "the line of ordinary low tide of May 4, 1852," and this description was carried into the judgment and the final order of condemnation. In the present action the plaintiff sought to recover possession of a tract described as bounded on the north by "the line of ordinary low tide of May 4, 1852," and the judgment under review awards to the plaintiff recovery of the possession of a parcel of land so bounded. The boundary of the corporate limits of the town of Oakland and of the lands granted to the town by the state,

as described by the act of 1852, is the line of "ship channel." Until the decision of this court in *City of Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160, [50 Pac. 277], the meaning of the term "ship channel" had never been authoritatively declared. Both parties to that litigation contended for a construction which would extend the grant beyond the shore and over navigable water. The assumption on all hands was that the legislature, in using the words "ship channel," meant "the three fathom line or the four fathom line in the bay." (118 Cal. 177, [50 Pac. 283].) Such interpretation was definitely rejected by this court, which declared that the term "ship channel," as used in the act of 1852, meant the line of low tide. To this extent both parties to the present appeal are agreed. But, as we have already observed, the city contends that the boundary is the line of low tide as it existed at the date of the passage of the act, while the appellants maintain that the boundary described in the act is the line of low tide as such line may appear from time to time. [1] In other words, the appellants contend for the application of the rule that a boundary marked by a water line is a shifting boundary, going landward with erosion and waterward with accretion. This is unquestioned law where the land is bordered by a running stream. (*Philadelphia Co.* v. *Stimson,* 223 U. S. 605, [56 L. Ed. 570, 32 Sup. Ct. Rep. 340]; *Missouri* v. *Nebraska,* 196 U. S. 23, 35, [49 L. Ed. 372, 25 Sup. Ct. Rep. 155]; *Tappendorff* v. *Downing,* 76 Cal. 169, [18 Pac. 247]; *Fillmore* v. *Jennings,* 78 Cal. 634, [21 Pac. 536]; 9 C. J. 195.) Express statutory declaration to this effect is found in section 1014 of our Civil Code. But at common law the rule was the same where the land was bounded by tidal water (*Scratton* v. *Brown,* 4 B. & C. 485), and in a recent case this court has declared this to be the law of our state, expressly declining to accede to the claim that section 1014 of the Civil Code limits the application of the rule to lands bordering on flowing streams. (*Strand Improvement Co.* v. *Long Beach,* 173 Cal. 765, [161 Pac. 975].)

[2] It would seem, therefore, that the true interpretation of the term "ship channel," as used in the act of May 4, 1852, is the line of low tide, as affected by such gradual and imperceptible changes as may from time to time take place in the location of that line. The city's claim that the boundary is an unchanging one, fixed by the line as it existed on May 4,

1852, finds its source of inspiration in an expression used by Chief Justice Beatty in his opinion in *Oakland* v. *Oakland Water Front Co.*, 118 Cal. 180, [50 Pac. 284]. In the course of his elaborate and learned discussion the late chief justice said: "My conclusion is, that the line of low tide as it existed on the 4th of May, 1852, was the western boundary of the town of Oakland intended by the original act of incorporation." Too much weight is not to be attributed to this reference to a specific date. The argument based upon it affords a very apt illustration of the wisdom of the settled rule that expressions in a judicial opinion must be read in the light of the particular question presented for decision and under consideration. In the argument of the Oakland Water Front case no contention on the point now under discussion had been made by either party. As we have already said, both sides were contending for a deep water line. It was this issue which the chief justice was meeting, and he met it by declaring that "ship channel" meant the line of low tide, rather than a three or four fathom line. The reference to the line as it existed on a given date was, in a sense, inadvertent or accidental. But beyond all this, the opinion of Chief Justice Beatty did not receive the assent of a majority of the court. Two justices only concurred in it, while two others filed separate concurring opinions, in which they stated merely that they agreed that the land was limited by the line of low tide. The remaining members of the court dissented, and expressed no view on the question of the boundary of the legislative grant. The concurrence of four members of the court is necessary to a decision in bank, and the only thing decided with reference to the point under discussion was, therefore, that the boundary of the town of Oakland, and of the grant to the town, was the line of low tide. (*Del Mar Water etc. Co.* v. *Eshleman*, 167 Cal. 666, 682, [140 Pac. 591, 948].) The judgment was reversed, and upon further proceedings a new judgment was entered in which the lands granted by the act of 1852 were described as bounded by the line of ordinary low tide. This judgment, which was subsequently affirmed by this court (*Oakland* v. *Oakland Water Front Co.*, 162 Cal. 675, [124 Pac. 251]), did not fix the line as of May 4, 1852, or any other date. Whether or not the second judgment, which was introduced in evidence at the trial of this action, is available to the appellants as an adjudication of the true limits of the

grant under which they claim is not the point here. We refer
to it simply to show that the case of *Oakland* v. *Oakland
Water Front Co.,* does not contain a judicial ,determination
in favor of the respondent's contention that the boundary is
the low tide line as of May 4, 1852.

As further support for its construction of the legislative
grant, respondent relies upon the decision of the United States
circuit court of appeals in *Western Pacific Ry. Co.* v. *South-
ern Pacific Co.,* 151 Fed. 376, [80 C. C. A. 606]. It is true
that in that case the court expressed the view that ''the grant
made by the state to the town of Oakland in 1852 was in-
tended to have fixed and permanent boundaries,'' and reached
the conclusion, apparently, that to give effect to this intention
it was necessary to hold that the land was bounded by the
low tide line as of the date of the act. The question was one
of the interpretation of an act of the state legislature, a matter
in which the federal court was concededly bound by the con-
struction placed upon the act by the highest court of the state.
If the circuit court of appeals was influenced in any degree
by the belief that this court had decided on the first appeal in
the Oakland Water Front case that the line was that of May
4, 1852, its view of the former decision is not in accord with
what we have here said. Another ground for the interpre-
tation placed on the grant by the learned federal court was
its conclusion that section 1014 of the Civil Code covers ''the
whole subject of the right to alluvion, and confines it to that
. . . which is formed on the banks of rivers or streams.''
Since the decision of the Western Pacific case, however, this
court, as noted above, has held in *Strand Improvement Co.*
v. *Long Beach,* 173 Cal. 765, [161 Pac. 975], that the code sec-
tion is not to be given this effect. In that case we expressly
declined to accept the construction placed upon the code sec-
tion by the circuit court of appeals.

To the suggestion that a boundary shifting with the location
of the tide line would be incapable of definite ascertainment,
we respond that in our judgment such a line is more readily
susceptible of location on the ground than a line not marked
by permanent monuments, and to be determined by conditions
as they existed many years ago. To fix the latter line, resort
must be had to oral testimony which is, in its nature, uncer-
tain, and may be difficult or impossible to obtain. At any
rate, the question being one of the construction of a statute of

this state, we cannot be bound by the decision of a federal court, however great our respect for that court, when such decision is at variance with the views expressed by the highest court of this state.

Nor was anything decided in *City of Oakland* v. *Wheeler*, 34 Cal. App. 442, [168 Pac. 23], which precludes us from now holding that the true line is the line of low tide as it may exist from time to time. In its opinion in that case, the district court of appeal quoted the language of Chief Justice Beatty to which we have referred. But the question under discussion was simply whether the complaint and the judgment contained a sufficient description of the property sought to be condemned. The property was described as bounded by the line of ordinary low tide of May 4, 1852, and the court was not called upon to decide whether this land marked the limits of the legislative grant. The city had the right to condemn as much or as little land as it chose. Having undertaken to condemn to the low tide line of May 4, 1852, the only question was whether that line was clearly ascertainable. The holding of the court was that, as a matter of pleading, the description was not insufficient, and that by the evidence in the case the line of May 4, 1852, had been located and identified. Any expression of opinion on the limits of the legislative grant, if there was such expression, was entirely unnecessary to the decision.

[3] Concluding, then, that the southerly limit of the lands formerly owned in fee by the defendants was the low tide line as it might exist from time to time, it is apparent that the plaintiff has not established its right to the possession of the land here involved. It did not on the trial undertake to show where, with reference to the present low tide line, the line of 1852 lay. The burden was upon it to show that the defendants were wrongfully in possession of the land sought to be recovered. If the low tide line at the time of the condemnation suit was south of the low tide line of 1852, the plaintiff was, by this judgment, awarded possession of an intervening strip belonging to the defendants. It was not for the latter, resisting this action for possession, to show affirmatively that they were entitled to some of the land claimed. It was for the plaintiff, asserting its right, to show that the present low tide line was located at or north of the northerly boundary of the property described in this complaint, and that it there-

fore was entitled to the possession of all of such land. But, going beyond the mere question of failure of proof, the record makes it apparent that the affirmance of this judgment would work a real and substantial injustice to the defendants. The area of land included between First Street on the north and a stone wall on the south was 162,947 square feet. This stone wall lies northerly, that is to say above, the line claimed by the defendants to be the low tide line as of the time of the condemnation proceeding. The jury in that proceeding returned, in addition to its general verdict, a special finding that the land bounded on the south by the low tide line of May 4, 1852, included 80,961 square feet, and this verdict was carried into the judgment by way of recital. If, as matter of law and fact, the defendants really owned the rest of the parcel north of the stone wall, they still retained, after the condemnation suit, the ownership of an area of 81,986 square feet, and the effect of the present judgment clearly is to take this land from them without compensation, if in fact the low tide line of 1911 was southerly of the stone wall. The same result, in different degree, would follow if the low tide line of 1911 lay anywhere southerly of a line drawn to include, between itself and First Street, the 80,961 square feet which the jury found to be covered by the description in the condemnation complaint. Before the plaintiff can prevail in this action it must either establish that the land condemned by it includes all of the land above the low tide line as it existed at the date of the institution of the condemnation suit, or it must acquire by condemnation or purchase the land between the low tide line of May 4, 1852, and the low tide line of the date of such acquisition.

These views make it unnecessary to consider a number of points argued by counsel. [4] We may say that we do not agree with the respondent's contention that the pleadings of the defendants were such as to preclude them from contending that the boundary was not the tide line of May 4, 1852. In their answer they set up that the true boundary was the line of extreme low tide, rather than ordinary low tide. But there was nothing in the pleading which binds them to the position that either line is to be fixed as of its location at the date of the passage of the act of 1852.

Whether or not the respondent would be entitled to the benefit of any changes in the low tide line produced by artifi-

cial structures is a question suggested in the briefs, but not argued to any extent. We do not find it necessary to decide it here, and mention it merely to avoid the implication that a view either way is involved in what we have said.

The judgment is reversed.

Shaw, J., Wilbur, J., Melvin, J., Lennon, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.

Shaw, J., Melvin, J., Wilbur, J., and Lennon, J., concurred.